Harold GELB, Plaintiff,

v.

AMERICAN TELEPHONE & TELE-
GRAPH COMPANY, Robert E. Allen,
Morris Tanenbaum and John Does I–X,
Defendants.

90 Civ. 7212 (LMM).

United States District Court,
S.D. New York.

Feb. 8, 1993.

Order Denying Reargument
Feb. 26, 1993.

Roger W. Kirby, Kaufman Malchman Kaufmann & Kirby, New York City (Henry P. Monaghan, of counsel), for plaintiff, Harold Gelb.

Robert W. Hirth, Claire Shows Hancock, Sidley & Austin, New York City, for defendants, AT & T, Allen and Tanenbaum.

MEMORANDUM AND ORDER

McKENNA, District Judge.

### I.

Defendants American Telephone & Telegraph Company ("AT & T"), Robert E. Allen (Chairman and Chief Executive Officer of AT & T), and Morris Tanenbaum (Vice Chairman and Chief Financial Officer of AT & T), move, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss the Amended Class Action Complaint ("Amended Complaint").[1] The Amended Complaint is based on the claim that (stated generally) defendants are "carrying out a scheme to defraud class members"—holders of AT & T "calling cards," *i.e.*, telephone credit cards—"by inducing them to use AT & T calling cards in the belief that the card's use is free (*i.e.*, there is no additional charge for placing a call using the card)," whereas "[i]n fact, AT & T levies a substantial surcharge for their use." (Am.Compl. ¶ 1(A).)

Defendants also move for an order pursuant to Fed.R.Civ.P. 26(c)(7) sealing the Amended Complaint and plaintiff's Brief in Opposition to Defendants' Motion to Dismiss, at least to the extent that they make public Exhibits A, B, C, D, F, and G to the Amended Complaint, and the information contained therein.[2]

The Amended Complaint asserts three claims: the first for fraud, as a matter of federal common law, the second for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and the third asserting deceptive acts and practices and false advertising in violation of New York General Business Law §§ 349 and 350, and the common law of New York. On the present motion, all well pleaded allegations of the Amended Complaint are taken as true, and all reasonable inferences from the facts alleged are drawn in plaintiff's favor.

1. No motion to certify the alleged class has, as yet, been filed. None of the alleged John Does I–X, "various corporations, partnerships, directors, officers, principals, trustees, agents, or representatives of AT & T who have engaged or participated in the unlawful acts alleged" in the Amended Complaint, *id.* ¶ 8, have been served or identified.

2. The materials and information sought to be protected have, by agreement, been maintained as confidential pending determination of this aspect of defendants' motion.

Defendants argue that the 18 U.S.C. § 1962(a) component of the RICO claim must be dismissed because it "fails to satisfy the well-established requirement that a plaintiff's injury be caused by the investment of racketeering proceeds as opposed to injury caused by the underlying predicate acts of fraud" and that the 18 U.S.C. § 1962(c) component must be dismissed as to Allen and Tanenbaum because it "fails even to purport to satisfy the minimal requirements of [Fed.R.Civ.P.] Rule 9(b), such as pleading facts concerning defendants Allen and Tanenbaum's participation in the acts of alleged mail and wire fraud." (Def. Reply Mem. at 2.)[3] The common law fraud claims, Allen and Tanenbaum assert, also fail to satisfy Rule 9(b). The New York statutory and common law claims, defendants further argue, fail to state a claim for relief because the application of federal common law—which defendants do not dispute governs the first claim of the Amended Complaint—preempts the state law claims. Finally, according to defendants, the "filed rate doctrine" requires dismissal of all of plaintiff's claims.

## II.

In *Nordlicht v. New York Telephone Co.*, 799 F.2d 859 (2d Cir.1986), *cert. denied*, 479 U.S. 1055, 107 S.Ct. 929, 93 L.Ed.2d 981 (1987), the Court found that certain claims with respect to the defendant's billing of telephone calls—including a fraud claim based upon the alleged misrepresentation of the pricing of calls, *id.* at 866—were governed by federal common law. *Id.* at 862 (quoting *Ivy Broadcasting Co. v. American Telephone & Telegraph Co.*, 391 F.2d 486, 491 (2d Cir.1968)). Here, plaintiff's first claim, added to the claims of the original complaint by amendment and denominated "Scheme to Defraud," and specifically invoking federal common law (Am.Compl. ¶ 41), asserts a claim for fraud governed by federal common law,

and gives this Court subject matter jurisdiction. Defendants do not argue to the contrary. (*Cf.* Def. Reply Mem. at 2–3 ("defendants do not dispute that federal common law applies to the common law fraud claim asserted against AT & T").)[4]

## III.

Plaintiff's second claim, brought under RICO, turns on the charge that "[t]hroughout the class period, defendants, in conducting the affairs of AT & T, knowingly and repeatedly misrepresented that AT & T's calling card was 'free' and concealed or omitted to disclose in a non-misleading manner the material fact that AT & T imposed a substantial surcharge for its use." (Am.Compl. ¶ 43.) The scheme involved, says plaintiff, "on more than many thousands of occasions and within the last ten years," mail and wire communications in violation of 18 U.S.C. §§ 1341 and 1342. (*Id.* ¶ 44.)

Plaintiff alleges that "AT & T has received income that has been unlawfully used and invested in the operation of AT & T . . . in violation of 18 U.S.C. § 1962(a) and to the financial detriment of plaintiff and his class." (*Id.* ¶ 45(a).) To state a claim under § 1962(a), a plaintiff "must allege injury from the defendants' investment of racketeering income in an enterprise." *Ouaknine v. MacFarlane*, 897 F.2d 75, 83 (2d Cir.1990). Under § 1962(a), in other words, a plaintiff's injury must be the result of a defendant's investment of the proceeds of the predicate acts, rather than of the predicate acts themselves. The Amended Complaint, however, does not allege "facts asserting injury by reason of defendants' investment of racketeering income." *Id.* at 82–83. That revenue from customers' use of calling cards, allegedly fraudulently induced, may be invested in the promotion of calling cards, or in other activities of AT & T, is not sufficient to state a claim under § 1962(a).

---

**3.** The Amended Complaint withdraws the allegations with respect to 18 U.S.C. § 1962(b) contained in the original complaint. (*See* Pl. Mem. at 16.)

**4.** Defendants do assert, however, that plaintiff's first claim should be dismissed: as failing to comply with Fed.R.Civ.P. 9(b) in the case of Allen and Tanenbaum, and as barred by the filed rate doctrine in the case of all defendants. *See* below.

The causal connection is tenuous at best. The direct cause of plaintiffs' alleged injuries was the fraudulent conduct. Plaintiffs have neither alleged nor demonstrated a connection with the use or investment of racketeering income other than the normal reinvestment of corporate profits.

If this remote connection were to suffice, the use-or-investment injury requirement would be almost completely eviscerated when the alleged pattern of racketeering is committed on behalf of a corporation. RICO's pattern requirement generally requires long-term continuing criminal conduct. *See H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 [109 S.Ct. 2893, 106 L.Ed.2d 195] (1989). Over the long term, corporations generally reinvest their profits, regardless of the source. Consequently, almost every racketeering act by a corporation will have some connection to the proceeds of a previous act. Section 1962(c) is the proper avenue to redress injuries caused by the racketeering acts themselves. If plaintiffs' reinvestment injury concept were accepted, almost every pattern of racketeering activity by a corporation would be actionable under § 1962(a), and the distinction between § 1962(a) and § 1962(c) would become meaningless.

*Brittingham v. Mobil Corp.*, 943 F.2d 297, 305 (3d Cir.1991).

Plaintiffs' RICO claim, to the extent that it alleges a violation of § 1962(a), is dismissed.

## IV.

■ As regards plaintiff's claim under 18 U.S.C. § 1962(c), defendants urge that, in the case of Allen and Tanenbaum, the Amended Complaint fails to satisfy the requirement of Fed.R.Civ.P. 9(b) that "the circumstances constituting fraud ... shall be stated with particularity." "At a minimum, a RICO pleading based on mail and wire fraud must aver the time, place and content of the allegedly fraudulent statements." *A.R. Associates v. Atlantic–Pacific Collection Services, Inc.*, 1987 WL 7732 * 3 (S.D.N.Y.1987). Further, "[a]llegations of fraud that refer only to the 'defendants,' without connecting particular misrepresentations to particular defendants, fail to satisfy the particularity requirements of Rule 9(b)." *Official Publications, Inc. v. Kable News Co.*, 692 F.Supp. 239, 246 (S.D.N.Y.1988), *aff'd in part, rev'd in part on other grounds*, 884 F.2d 664 (2d Cir.1989). The Amended Complaint fails to satisfy these requirements in its allegations against Allen and Tanenbaum, and its RICO claim, to the extent that it alleges a violation of § 1962(c) against those defendants, is dismissed.

## V.

The failure to plead fraud with particularity as against Allen and Tanenbaum is equally apparent in the first, common law fraud, claim of the Amended Complaint, and that claim, as well, is dismissed as to those defendants.

## VI.

■ The third claim of the Amended Complaint alleges the violation of New York General Business Law §§ 349 and 350, and the common law of New York, asserting that "AT & T's advertising is and has been a deceptive act or practice or false advertising respecting its calling card." (Am. Compl. ¶ 51.)

Defendants, correctly in this Court's view, urge that if federal common law applies to plaintiff's fraud claims—as plaintiff asserts, and defendants concede that it does—then the law of New York cannot also apply, that federal common law preempts state law. In *Nordlicht*, the Second Circuit noted that in *Ivy Broadcasting* it had held that "federal common law preempts state law and supplies the rule of decision for tort and contract claims relating to the duties, charges, and liabilities of telephone carriers concerning interstate telecommunications." 799 F.2d at 864.

The third claim of the Amended Complaint is dismissed.

## VII.

 Defendants, finally, urge that under the filed rate doctrine, the entire complaint must be dismissed. That doctrine, they urge, "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority." *Arkansas Louisiana Gas Co. (Arkla) v. Hall*, 453 U.S. 571, 577, 101 S.Ct. 2925, 2930, 69 L.Ed.2d 856 (1981). Under the doctrine, "[t]he rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier." *Keogh v. Chicago & Northwestern Ry. Co.*, 260 U.S. 156, 163, 43 S.Ct. 47, 49, 67 L.Ed. 183 (1922) (citations omitted).

Here, it is not disputed on the present motion at least that AT & T has filed a tariff specifying its charges for use of the calling card. Plaintiff, however, does not challenge "the reasonableness of the surcharge imposed for use of the card. Rather, plaintiff's only claim is one of market fraud in advertising, that is, an effort by deceit to induce use of the card." (Pl's. Mem. at 12.) Since, as appears above, plaintiff's claims against AT & T (although not Allen and Tanenbaum) for fraud as a matter of federal common law and for violation of 18 U.S.C. § 1962(c) survive the present motion, the issue whether those claims are barred by the filed rate doctrine must be determined.

Because the liability issue in this case is not what a reasonable rate should be but whether defendant AT & T committed fraud and violated RICO in inducing customers' use of its calling cards, a determination of what the rate should have been can enter in (if at all) only at the point of determining damages. As the Court's discussion will highlight, the usual policy justifications for applying the filed rate doctrine are thus not applicable to the nature of the fraud alleged here. Insofar as the federal common law fraud claim and the RICO claim are predicated upon the same allegedly fraudulent conduct, the Court's analysis of the applicability of the filed rate doctrine necessarily applies to both claims. In considering the issue of damages *infra*, the Court will discuss the RICO claim separately.[5]

### A.

### *Development of Filed Rate Doctrine*

The plaintiff in *Keogh*, a manufacturer, brought an action under § 7 of the Sherman Anti–Trust Act against various carriers for damages resulting from the carriers' conspiratorial effort to exact a rate higher than that which would otherwise have prevailed. The Court's reasoning made clear one of the long-standing policy justifications for the filed rate doctrine. "This stringent rule prevails, because otherwise the paramount purpose of Congress—prevention of unjust discrimination—might be defeated." *Keogh*, 260 U.S. at 163, 43 S.Ct. at 49–50. In other words, once the tariff has been filed, the purpose of the filing being to establish uniform nondiscriminatory rates through a public decision-making process by an appropriate regulatory authority, no court action should undo it for an individual aggrieved by that rate. The Court considered several factors in reaching its decision. Among these were: first, that the Act to Regulate Commerce, implicated by the claim, provided a remedy for injured parties; therefore, it was unlikely Congress intended to grant another remedy under the Sherman Act; second, that permitting courts to retroactively establish rates (reasonable and nondiscriminatory rates) for certain parties would require "reconstituting the whole rate structure for many articles moving in

---

**5.** The fact that other RICO claims implicating the filed rate doctrine have been dismissed is not necessarily dispositive of the present RICO claim. In other cases, the decisions to apply the filed rate doctrine and dismiss the RICO claims were primarily predicated upon the nature of the underlying fraudulent conduct, and not merely upon the fact that the claims were brought under RICO. The applicability of the filed rate doctrine is determined by the statutes empowering agencies to approve rates, not the statutes under which a plaintiff alleges a cause of action. However, as discussed *infra*, at least one Court of Appeals has considered the unique nature of RICO claims as a factor in determining the appropriateness of relief within the constraints of the filed rate doctrine.

an important section of the country." *Id.* at 164, 43 S.Ct. at 50.

In *Montana–Dakota Utilities Co. v. Northwestern Public Service Co.*, 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951), without specifically mentioning *Keogh* or the filed rate doctrine, the Court refused to grant relief in the face of an alleged fraud and the absence of a federal administrative remedy or federal cause of action. The petitioner's argument centered around the fact that due to the interlocking boards of the regulatory agency and petitioner's predecessor, petitioner's predecessor was deprived of its independence and power to resort to its administrative remedy, resulting in unreasonably high electric rates. The Court based its refusal to grant relief on the fact that the plaintiff was requesting a judicial determination of a reasonable rate, an issue the Court found to be nonjusticiable and more appropriately determined by the regulatory agency.

The Supreme Court's most recent decision dealing with the filed rate doctrine demonstrates the Court's continued adherence to the principles underlying the doctrine. *Maislin Industries U.S. v. Primary Steel, Inc.*, 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990). At issue in *Maislin* was the Interstate Commerce Commission's ("ICC's") determination that § 10701 of the Interstate Commerce Act permits the ICC to evaluate "all the circumstances surrounding an undercharge suit" to determine whether an unreasonable practice had occurred where a carrier had negotiated lower rates than those on file with the ICC. *Id.* at 124, 110 S.Ct. at 2764. In *Louisville & Nashville Ry. Co. v. Maxwell*, 237 U.S. 94, 35 S.Ct. 494, 59 L.Ed. 853 (1915), the Court had articulated what has become a caveat to the filed rate doctrine: the filed rate is not enforceable if the ICC finds the rate to be unreasonable. *Id.* at 97, 35 S.Ct. at 495; *Keogh*, 260 U.S. at 163, 43 S.Ct. at 49. In *Maislin*, the Court declined to re-fashion the filed rate doctrine to preclude collection of the filed rate where the ICC found that the carrier engaged in an unreasonable *practice*, reasoning that "[b]y refusing to order collection of the filed rate solely because the parties had agreed to a lower rate, the ICC has permitted the very price discrimination the Act by its terms seeks to prevent." *Maislin*, 497 U.S. at 130, 110 S.Ct. at 2768.

The Court was unpersuaded by the ICC's argument that the carrier should not receive a windfall for its failure to comply with the statute by registering its negotiated rate. Justifying its holding, the Court reasoned that punishment for fraudulent conduct, such as a "bait and switch" tactic of negotiating one rate, stating it had been filed when it had not been, and then insisting upon collection of the higher rate, is punishable under 49 U.S.C. § 11903(b) (1988). The Court further noted that "this risk of intentional misconduct on the part of a carrier has always existed and has never been considered sufficient to justify a less stringent interpretation of § 10761." *Id.* at 132 n. 12, 110 S.Ct. at 2769 n. 12. The fact that the Court expanded the filed rate doctrine to encompass invalidation of a reasoned and forcefully presented ICC policy demonstrates the seven justice majority's commitment to the doctrine.[6]

The Supreme Court cases illustrate the two core principles of the filed rate doctrine: that legislative bodies design agencies for the purpose of setting uniform rates and that courts are not institutionally well suited to engage in retroactive rate setting. *See Wegoland, Ltd. v. NYNEX Corp.*, 806 F.Supp. 1112, 1115 (S.D.N.Y. 1992). In *Wegoland*, Judge Wood referred to these principles as the "anti-discrimination strand" and the "non-justiciability strand" respectively. *Id.* at 1115.

In filed rate cases alleging fraud or other illegal activity, the Supreme Court has not sanctioned a *general* exception to the filed

---

**6.** In his dissent, Justice Stevens, joined by Chief Justice Rehnquist, argued that the majority was applying the filed rate doctrine outside its previous bounds, thereby undermining the ICC's attempt to carry out the plainly expressed intent of Congress by going against the agency's reasonable action in contravention of *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *Maislin*, 497 U.S. at 152, 110 S.Ct. at 2779 (Stevens, J., dissenting).

rate doctrine. Indeed, the *Keogh* case described *supra* involved a type of fraud, an alleged conspiracy to fix rates at an unreasonably high level. The *Arkla* case, 453 U.S. 571, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981), involved an allegedly discriminatory rate originating in a contract. The Court reasoned that courts should refrain from disturbing the uniformity of rates required by statute and enforced by the administrative agency. A footnote in the opinion underscores that the Court's holding in that case did not extend to a hypothetical case involving fraudulent conduct. "[T]he record contains no findings of misconduct.... We save for another day the question whether the filed rate doctrine applies in the face of fraudulent conduct." *Id.* at 583 n. 13, 101 S.Ct. at 2933 n. 13. In *Square D Company v. Niagara Frontier Tariff Bureau,* 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986), the Supreme Court upheld the rule established in *Keogh* that shippers could not bring a treble damages antitrust action based on the allegation that the rates filed were fixed pursuant to an agreement prohibited by the Sherman Act. In *Square D,* the Court expressly rejected the invitation of Judge Friendly of the Second Circuit Court of Appeals to overrule *Keogh* in light of "subsequent developments." *Id.* at 423–24, 106 S.Ct. at 1930. The Court's opinion establishes that at least certain circumstances of fraud, even where various utilities allegedly illegally conspired among themselves, do not warrant a departure from the filed rate doctrine.

Moreover, while the Court seemed to acknowledge that certain developments may have undermined somewhat the original rationale underlying *Keogh,* it declined to undermine the established interstices of the filed rate doctrine. Judge Friendly's list of "developments" thus failed to move the Supreme Court to overrule *Keogh.* The developments Judge Friendly discussed and the Supreme Court listed in its own discussion were

> the development of class actions, which might alleviate the expressed concern about unfair rebates; the emergence of precedents permitting treble-damages remedies even when there is a regulatory remedy available; the greater sophistication in evaluating damages, which might mitigate the expressed fears about the speculative nature of damages; and the development of procedures in which judicial proceedings can be stayed pending regulatory proceedings.

*Id.* at 423, 106 S.Ct. at 1930. The Court's reluctance to undermine *Keogh* on the *Square D* facts was linked to the nature of the claim—an antitrust claim—at issue in both cases. "[T]he *Keogh* rule has been an established guidepost at the intersection of the antitrust and interstate commerce statutory regimes for some 6½ decades. The emergence of subsequent procedural and judicial developments does not minimize *Keogh*'s role as an essential element of the settled legal context in which Congress has repeatedly acted in this area." *Id.*

While committed to the filed rate doctrine as a matter of *stare decisis,* however, the Court has not recently expressed an inclination to extend the filed rate doctrine beyond contexts clearly implicating the anti-discrimination or non-justiciability rationales for the rule. The fact that a class action—the "development" on Judge Friendly's list most relevant to the present case—can eliminate or minimize the anti-discriminatory strand of the filed rate doctrine has not been directly addressed by the Court outside the passing reference in *Square D.* Nor, moreover, has this Court discovered cases seizing upon the class action aspect of a case as a justification for undermining the filed rate doctrine. *See, e.g. Wegoland,* 806 F.Supp. 1112 (in a lengthy opinion dealing extensively with problem of Court determining damages and its intrusion on agency rate-making authority, class action aspect never discussed as aspect of damages issue).

Defendants cite case law from various other circuits which have held that the filed rate doctrine bars claims of fraud based upon a carrier's concealment or misrepresentation of a filed rate. *See Marco Supply Co. v. AT & T Communications, Inc.,* 875 F.2d 434, 436 (4th Cir.1989); *Missouri Pacific Ry. Co. v. Rutledge Oil Co.,* 669

F.2d 557, 558–59 (8th Cir.1982); *Consolidated Freightways Corp. v. Terry Tuck, Inc.*, 612 F.2d 465, 466 (9th Cir.), *cert. denied*, 447 U.S. 907, 100 S.Ct. 2990, 64 L.Ed.2d 856 (1980); *Aero Trucking, Inc. v. Regal Tube Co.*, 594 F.2d 619, 622 (7th Cir.1979); *Illinois Central Gulf Ry. Co. v. Golden Triangle Wholesale Gas Co.*, 586 F.2d 588, 592 (5th Cir.1978). If plaintiff's claim is to survive this motion to dismiss, it must be because the fraud alleged is of a different kind than that routinely dismissed by the federal courts as barred by the filed rate doctrine.

### B.

### *Application of Filed Rate Doctrine*

In considering the application of Supreme Court precedent to the present case, this Court is not persuaded that the particular facts alleged here fall within the factual predicates upon which the filed rate doctrine developed. The alleged fraudulent conduct forming the basis for both the federal common law claim and the RICO claim squarely implicates neither the anti-discrimination strand nor the non-justiciability strand of the filed rate doctrine.

Plaintiff's claim does not take issue with the reasonableness of defendant AT & T's filed rates nor does plaintiff seek to have any individual calling card holders charged a different rate. Moreover, plaintiff concedes that under the filed rate doctrine, if each member of the putative class were to bring a separate action alleging fraud, such "actions would in effect result in price discrimination because any corrective relief would ultimately necessitate a piecemeal deviation from the filed tariff rates." (Pl. Opp.Mem. at 12.) This admission is not insignificant when the Court appraises the possible remedies relating to Plaintiff's claims. Whether resolution of these claims would involve a violation of the principles of the filed rate doctrine seems to depend upon whether "damages in the amount of the surcharge" (as requested in the Amended Complaint at ¶¶ 34, 41) (due to the alleged fraudulent advertising campaign inducing unknowing individuals to acquire and use an AT & T calling card) are award-

ed to individual plaintiffs or whether a class is certified (which certification has not yet taken place) and all cardholders receive damages. To grant damages to only some cardholders would effectively result in a discriminatory departure from the filed rates in violation of the filed rate doctrine. Moreover, even if the class is certified (which certification itself would depend partially upon the feasibility of determining and awarding damages to the class), the mere granting of a damages award may, in this context, run afoul of the filed rate doctrine. The Court will further discuss this issue *infra*.

The cases decided by the Courts of Appeals have involved situations clearly implicating the anti-discrimination and the non-justiciability strands of the doctrine. *Marco Supply*, 875 F.2d at 436 (customer alleges willful misrepresentation of rates as to himself by AT & T and held not actionable); *Missouri Pacific*, 669 F.2d at 559 (claim for fraud based on misleading advice not actionable "where the result would be a rate preference"); *Consolidated Freightways*, 612 F.2d at 466 (alleged misquotation of tariffs to petitioner is not actionable); *Aero Trucking*, 594 F.2d at 622 n. 1 (alleged fraudulent statements by carrier do not alter "Act's purpose of enforcing rate uniformity"); *Illinois Central*, 586 F.2d at 588 (alleged fraudulent inducement that tariff would not apply to lease rejected because "Interstate Commerce Act was designed to provide uniformity in charges for services, and ... to prevent rate discrimination").

There is little relevant precedent in the Second Circuit regarding the applicability of the doctrine in cases of fraud. This Court need not take the broad language appearing in the dicta of the district court and the Court of Appeals in *Nordlicht v. New York Telephone Co.*, 617 F.Supp. 220, 227–28 (S.D.N.Y.1985), *aff'd*, 799 F.2d 859 (2d Cir.1986), *cert. denied*, 479 U.S. 1055, 107 S.Ct. 929, 93 L.Ed.2d 981 (1987), to its extreme. In fact, as the discussion *infra* will develop, neither the anti-discrimination nor the non-justiciability strand is applicable in the present case and this Court finds

no reason to employ the doctrine in a manner that in effect extends a regulated entity's immunity from suit.[7]

One aspect of the courts' rationale for applying the filed rate doctrine despite the harsh results for individual plaintiffs with claims of apparent merit but for the doctrine is that due to the "public" nature of agency rate making procedures, "the shipper's knowledge of the lawful rate is conclusively presumed." *Kansas City S.R. Co. v. Carl*, 227 U.S. 639, 653, 33 S.Ct. 391, 395, 57 L.Ed. 683 (1913); *Maislin*, 497 U.S. at 127 n. 9, 110 S.Ct. at 2766 n. 9; *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 306 n. 14, 96 S.Ct. 1978, 1988 n. 14, 48 L.Ed.2d 643 (1976); *Pittsburgh C., C. & St. L.R. Co. v. Fink*, 250 U.S. 577, 581, 40 S.Ct. 27, 27, 63 L.Ed. 1151 (1919); *Marco Supply*, 875 F.2d at 436; *Aero Trucking*, 594 F.2d at 622. The public is charged with knowledge of filed rates in order to prevent claims of entitlement (whether contract or tort related) to lower rates, thereby undermining the goal of uniformity envisioned by legislatures in setting the regulatory schemes. However, the fraud alleged in this case relates only indirectly to the tariff at issue.

Plaintiff's claims assail defendant AT & T's advertising practices. The alleged fraud in this case does not directly relate to the jurisdiction of the FCC, in contrast to the hypothetical constructed by the Supreme Court in *Nader*. In a footnote, the Court stated that

> *if* respondent's [airline's] overbooking practices were *detailed in its tariff* and therefore available to the public, a court presented with a claim of misrepresentation based on failure to disclose need not

make prior reference to the Board, as it should if presented with a suit challenging the reasonableness of practices detailed in a tariff. Rather, the court could, applying settled principles of tort law, determine that the tariff provided sufficient notice to the party who brought the suit.

*Nader*, 426 U.S. at 306, 96 S.Ct. at 1988 (emphasis added). Nothing in the FCC's calling card tariff approval deals with the issue of defendant AT & T's advertising practices. The holding in *Nader* confirms that the Supreme Court does not view the filed rate doctrine as a bar to all tort claims with an indirect nexus to the rate setting function of agencies such as the Civil Aeronautics Board in that case. The Court held that plaintiff's common law tort action based on fraudulent misrepresentation did not have to be stayed pending reference to the Board. "The standards to be applied in an action for fraudulent misrepresentation are within the conventional competence of the courts." *Id.* at 305, 96 S.Ct. at 1987. As in the *Nader* case, the nature of the fraud alleged here does not involve "considerations of uniformity in regulation and of technical expertise." *Id.* at 304, 96 S.Ct. at 1987. Defendant AT & T cannot insulate itself from all tort claims simply by invoking the filed rate doctrine.[8]

The fact that the fraud plaintiff alleges is of a *universal* nature further undermines the relevance of the "presumed knowledge" rationale. In virtually all other claims involving the filed rate doctrine, a single litigant or a very small group, allegedly wronged, have brought suit. Presumably, without the operation of the filed rate doctrine, numerous other individuals would

---

**7.** The other relevant district court opinions dealing with the filed rate doctrine in this circuit have involved the anti-discrimination or the non-justiciability strand of the filed rate doctrine. *Wegoland*, 806 F.Supp. at 117–119 (concluding no general exception to the filed rate doctrine for fraud upon a regulatory commission based on non-justiciability strand); *Brookman & Brookman v. MCI Telecommunications Corp.*, 1991 WL 107421 at *1, 1991 U.S. Dist. LEXIS 7937 at *3 (S.D.N.Y.1991) (alleged contract between plaintiff and MCI was inconsistent with MCI tariff and therefore foreclosed); *Delta Traffic Service, Inc. v. Appco Paper &*

*Plastics Corp.*, 1988 WL 127528 at *5 (E.D.N.Y. 1988) (filed rate doctrine requires that "[n]o contract [between shipper and carrier] could reduce the amount legally payable" to carrier).

**8.** The applicability of the filed rate doctrine may depend upon the nature of the relief sought. To the extent that Plaintiff seeks declaratory or injunctive relief, the filed rate doctrine would seem inapplicable. As the Court will discuss *infra*, the issue of money damages is more complex.

be left to pay the lawfully filed rate, thus creating an unequal situation contrary to the legislative intent in mandating uniform rates. *But see Wegoland,* 806 F.Supp. at 1115 (in putative class action by all rate payers alleging fraud, district court reasoned that need for court to determine rate retroactively required adherence to the filed rate doctrine).

In addition to the universal nature of the fraud alleged in the present case, plaintiff's fraud allegation does not attack the "reasonableness" of the rates. The difficulty of determining reasonableness of rates retroactively and the discrimination involved in refunding to particular individuals filed rates paid on grounds of fraud are at the heart of courts' reluctance to entertain claims involving rate-making, even where fraudulent conduct involving the carrier and/or the regulating agency is involved. *See H.J., Inc. v. Northwestern Bell Telephone Co.,* 954 F.2d 485, 491 (8th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 2306, 119 L.Ed.2d 228 (1992) (explaining nonapplication of filed rate doctrine in *City of Kirkwood v. Union Electric Co.,* 671 F.2d 1173 (8th Cir.1982), *cert. denied,* 459 U.S. 1170, 103 S.Ct. 814, 74 L.Ed.2d 1013 (1983), in that antitrust damages based on price squeeze did not conflict with agency control over rates because plaintiff did not challenge reasonableness determinations); *Gulf States Utilities Co. v. Alabama Power Co.,* 824 F.2d 1465, 1471–72 (5th Cir. 1987) (stating contracts might be set aside if plaintiff could show fraudulent inducement, because such a remedy "would not interfere with the [federal agency's] ratemaking powers"); *Litton Systems, Inc. v. American Telephone & Telegraph Co.,* 700 F.2d 785, 820 (2d Cir.1983), *cert. denied,* 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984) (distinguishing *Keogh* "because the issue here is not the reasonableness of the ... rate as compared to some other rate that might have been charged, but instead whether the [agency] requirement itself was reasonable, i.e. whether there should

have been any charge at all"); *Wegoland,* 806 F.Supp. at 1116 (filed rate doctrine "arguably inapplicable" in cases where court "not asked to decide what a reasonable rate would have been"). Plaintiff's claims in the present case involve marketwide fraud in advertising, "an effort by deceit to induce use of the card." (Pl. Opp.Mem. at 12.) The district court in *Nordlicht,* 617 F.Supp. at 227–28, linked applicability of the filed rate doctrine to whether the court was required to examine the reasonableness of rates.[9]

> Claims of fraud are different. The filed tariff doctrine is designed to protect utilities charging filed rates for lawfully provided service. It is of no help to a defendant which fraudulently induces a plaintiff to pay a filed rate or which otherwise exacts payment by fraud. There is nothing in the policy underpinnings of the doctrine which would cause it to protect a defendant which unlawfully exacts payment, even at a lawful rate.

The language in *Nordlicht* is clearly dicta, because the court dismissed the claim for failure to adequately allege fraud. The Court of Appeals specifically addressed the district court's dismissal of the fraud claim, stating that "Nordlicht's fraud claim also had potential viability" and that had he alleged affirmative misrepresentation by the phone company, "Nordlicht would indeed have established a right to recover for fraud." *Id.* at 866. The Court of Appeals did not discuss the filed rate doctrine.

At least two decisions have expressly noted the inapplicability of the reasoning in *Nordlicht* to their cases because the nature of the claims required a reasonableness determination. *See H.J., Inc.,* 954 F.2d at 490 ("The claim [involved in *Nordlicht*] did not attack the rate itself and did not require the court to 'second-guess' the rate-making agency"); *Wegoland,* 806 F.Supp. at 1116 ("The filed rate doctrine is arguably inapplicable in cases like *Nordlicht* because in those cases courts are not asked

---

**9.** Plaintiff's discussion of the *Noerr–Pennington* doctrine is relevant insofar as the cases cited illustrate courts' reluctance to "immunize a regulated entity from antitrust scrutiny" where "the issue ... is not the reasonableness of the ... tariff rate .. but instead ... whether there should have been any charge at all." *Litton,* 700 F.2d at 820;

to determine what a reasonable rate would have been.").

Because the fraudulent conduct alleged involves universal fraud and concealment of rates as to all cardholders by defendant AT & T (rather than fraud directed at a particular customer) and because the claim does not implicate in any manner the reasonableness of the filed rate, this Court rules that the filed rate doctrine does not apply. However, the Court's holding is a limited one in light of the Court's view that the filed rate doctrine may prohibit retroactive rate setting as part of the remedy. Plaintiff's monetary damages claim and claims for declaratory and injunctive relief will be discussed in turn.

### Monetary Damages

In denying the motion to dismiss, the Court reserves judgment as to whether the filed rate doctrine requires dismissal of plaintiff's damages claim. In their briefs pertaining to plaintiff's anticipated motion for class certification, the parties are directed to address the appropriateness of a damages award in light of the filed rate doctrine and the likelihood of arriving at a justiciable standard in light of the large class which plaintiff will seek to certify. The Court underscores its understanding that plaintiff's claim does not attack the filed tariff, but rather Defendant AT & T's advertising campaign. Plaintiff's claim, however, may indirectly implicate the rates, insofar as the monetary damages claim may (or must) ultimately reference the rates. As plaintiff's counsel pointed out in oral argument, the claim may involve "some impact on rates, but ... what doesn't? That's how AT & T lives, through its rates." (Transcript of Oral Argument at 20.) The issue, then, is whether an award of monetary damages against a regulated utility is prohibited by the filed rate doctrine despite the fact that the nature of the alleged fraud precludes applicability of the doctrine.

### RICO Damages

As Judge Wood noted in *Wegoland,* "The statutory reference point for applying the filed rate doctrine is the statute (or statutes) empowering agencies to approve rates, not the statutes under which plaintiffs allege a cause of action.... I note that it is entirely consistent with this opinion that a cause of action under RICO for fraud upon a regulatory agency would survive the filed rate doctrine." *Wegoland,* 806 F.Supp. at 1124 n. 8. This Court agrees with Judge Wood's statement that there is nothing inherent about RICO which would prohibit the survival of a RICO claim under the filed rate doctrine.[10]

The Second Circuit's decision in *County of Suffolk v. Long Island Lighting Co. (LILCO),* 907 F.2d 1295 (2d Cir.1990) is instructive on the issue of an award of damages in a RICO suit.[11] In *LILCO,* the Court did not discuss the filed rate doctrine; however, the opinion

> demonstrate[d] a willingness to permit an award of damages in a RICO suit to be determined by a court, even when that award required determining what portion

---

**10.** The Court has uncovered only one case that tentatively links the court's decision to apply the filed rate doctrine to the fact that the damages award would in effect result in a retroactive damages award *and* (because a RICO claim was involved) a more burdensome *treble* damages award. In *Taffet v. Southern Co.,* 967 F.2d 1483 (11th Cir.) (en banc), *cert. denied,* —— U.S. ——, 113 S.Ct. 657, 121 L.Ed.2d 583 (1992), the Court of Appeals found that to permit consumers' recovery for "fraudulent" or "erroneous" rates, the court would have to determine for itself a "reasonable" rate, disrupting states' regulatory schemes and forcing a refund to all consumers. *Id.* at 1491–92. In a footnote the Court of Appeals stated "[a] successful plaintiff under RICO recovers his damages threefold.... Thus, if the appellants in the cases at hand were successful in prosecuting their RICO claims, the Utilities would be forced to refund three times the amount allegedly overcharged." *Id.* at 1492 n. 10. The Eleventh Circuit thus seemed to hint that to grant RICO damages makes the rationale of the doctrine more compelling due to the fact that treble damages result in a quantitatively greater intrusion by a court into agency territory. Because this same argument applies in antitrust suits, the context in which the filed rate doctrine was originally (and many times since) applied, its significance is dubious.

**11.** The Court of Appeals held that RICO is applicable to a public state-regulated utility. *Id.* at 1305.

of a filed rate resulted from fraud. And, the Second Circuit's discussion (in dictum) of jurisdictional doctrines manifested a relaxed conception of the boundaries between courts and agencies, and a relatively expansive conception of federal court jurisdiction in rate-making cases. *Wegoland,* 806 F.Supp. at 1122-23. *See LILCO,* 907 F.2d at 1305-11. Judge Wood's lengthy discussion of *LILCO* persuasively agues that *LILCO* presented the Court of Appeals with "an unusually benign form of intervention in the rate-making process," and that the Court did not consider "the appropriateness of judicial intervention where such intervention would have more sweeping effects on the relation between courts and regulatory bodies," thereby supporting her conclusion that *LILCO* did not provide a basis for rejecting application of the filed rate doctrine to the case before her. *Wegoland,* 806 F.Supp. at 1123.

After the parties brief the damages issue, this Court will determine whether RICO (and other) monetary damages would be "unusually benign" as in *LILCO* or a similarly complicated, retroactive and inappropriate interference with a rate making agency as in *Wegoland.*

### Declaratory or Injunctive Relief

█ Regardless of the Court's decision as to monetary damages, the Court is convinced that the filed rate doctrine does not affect plaintiff's claim for declaratory or injunctive relief. Several courts have permitted such injunctive relief claims to move forward, even as the filed rate doctrine required dismissal of the claim for damages. In *Square D,* the Supreme Court explained the disposition of the case below:

> The Court of Appeals for the Second Circuit affirmed insofar as the District Court's judgment dismissed the claims for treble damages based on respondents' filed rates, but remanded for a further hearing to determine whether petitioners are entitled to injunctive relief and to give them an opportunity to amend their complaints to state possible

claims for damages not arising from the filed tariffs.

476 U.S. at 414, 106 S.Ct. at 1925. The Court took issue with the petitioners' view that the issue at stake in *Keogh* and *Square D* could be characterized as the defendants' "immunity." "The alleged collective activities of the defendants in both cases were subject to scrutiny under the antitrust laws by the Government and to possible criminal sanctions or equitable relief." *Id.* at 422, 106 S.Ct. at 1929. The Court then noted the "critical distinction between an absolute immunity from all antitrust scrutiny and a far more limited nonavailability of the private treble-damages remedy.... [T]he unchallenged Court of Appeals decision to remand on the question of injunctive and declaratory relief for antitrust violations highlight[s] this distinction...." *Id.* at 422 n. 28, 106 S.Ct. at 1930 n. 28.

The Sixth Circuit in *Pinney Dock and Transport Co. v. Penn Central Corp.,* 838 F.2d 1445 (6th Cir.), *cert. denied,* 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988), examined the Supreme Court's discussion of Judge Friendly's approach in *Square D* to the issue of injunctive relief, noting that the Supreme Court left undisturbed Judge Friendly's disposition of that issue. The court in *Pinney Dock* dismissed plaintiff's antitrust damage claims insofar as the claims were based on the relevant rates. However, the court held that to the extent that certain alleged acts by the defendants ("harassing tactics and spurious challenges to try to forestall legitimate business activities of competitors") were "unrelated to defendants' rates, any damages suffered therefrom would not be barred by *Keogh.*" *Id.* at 1457. Moreover, the court held that while plaintiff had raised "other claims as well, it is less clear from the face of these claims that they are rate-related and therefore within the scope of *Keogh.*" *Id.* Despite the ambiguous nature of plaintiff's claims, the court said "rather than requiring outright dismissal of these claims, ... we believe that plaintiffs should be afforded an opportunity on remand to amend their complaint in order to clarify these allegations to state a claim for damages

consistent with *Keogh*," *Id.* at 1458 (citing the Second Circuit and the Supreme Court decisions in *Square D*). While none of plaintiff's "other claims" were sufficiently clear as pleaded so as to preclude application of the filed rate doctrine, the Court of Appeals left open the possibility that certain behavior of the defendant could result in damages if not "rate-related" in origin.

It is clear to this Court that plaintiff has stated a federal common law fraud action and a RICO claim under 18 U.S.C. § 1962(c) that survive dismissal notwithstanding the filed rate doctrine. The parties shall address the appropriateness of money damages in the present case given the limitations posed by the filed rate doctrine when plaintiff files his motion for class certification, which motion shall be filed within 60 days of the date of this Memorandum and Order.

## VIII.

Defendants move for an order to seal Exhibits A, B, C, D, F and G as identified by plaintiff's Amended Complaint and as quoted in plaintiff's Brief in Opposition to Defendants' Motion to Dismiss, pursuant to Fed.R.Civ.P. 26(c). As a preliminary observation, the Court discerns no evidentiary reason or procedural requirement to account for plaintiff's decision to annex the exhibits in question to the Complaint; this tactic may have been an effort to gain publicity somewhat prematurely. However, in any event, the standard under Rule 26(c) is the relevant legal standard and defendants' motion must be evaluated thereunder. Rule 26(c) states, in relevant part, that

> upon motion by a party ... and for good cause shown, the court ... may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense, including ... that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way.

██ The decision to limit the open and far-reaching discovery permitted under the Federal Rules of Civil Procedure is left to the discretion of the trial court in light of the relevant facts and circumstances of a particular case. *See Nixon v. Warner Communications*, 435 U.S. 589, 599, 98 S.Ct. 1306, 1312, 55 L.Ed.2d 570 (1978). The Second Circuit has made clear that

> [a] plain reading of the language of Rule 26(c) demonstrates that the party seeking a protective order has the burden of showing that good cause exists for issuance of that order.... [I]f good cause is not shown, the discovery materials in question should not receive judicial protection and therefore would be open to the public for inspection.

> \* \* \* \* \* \*

> [W]e note that access [by class action litigants and the general public to discovery materials] is particularly appropriate when the subject matter of the litigation is of especial public interest.

*In re "Agent Orange"*, 821 F.2d 139, 145–46 (2d Cir.), *cert. denied*, 484 U.S. 926, 108 S.Ct. 289, 98 L.Ed.2d 249 (1987).

As explained in *John Does I–VI v. Yogi*, 110 F.R.D. 629 (D.D.C.1986), "[t]o establish good cause under Rule 26(c) the courts have generally required a 'particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements.' ... With respect to the claim of confidential business information, this standard demands that the company prove that disclosure will result in a 'clearly defined and very serious injury to its business.'" *Id.* at 632 (quoting *United States v. Exxon Corp.*, 94 F.R.D. 250, 251 (D.D.C. 1981) (citing *United States v. IBM Corp.*, 67 F.R.D. 40, 46 (S.D.N.Y.1975)).

A trade secret has been defined with reference to § 757 of the Restatement (First) of Torts. "[A] trade secret is any 'formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it....'" *I.B.M.* 67 F.R.D. at 46 n. 9. The present case does not involve defendants' refusal to furnish discovery materials on trade secret grounds; the plaintiff has already seen and utilized

the materials in the early stages of the action.

■ Plaintiff does not object to defendants' motion insofar as it concerns Exhibits F and G. The Court agrees with defendants' statement that Exhibits F and G are "more traditional examples of confidential information rising to the level of a trade secret." (Def. Mem. at 14.) These exhibits are not central to plaintiff's claims, but rather they center on internal financial operations. While they provide information relevant to this lawsuit (the volume of AT & T revenue attributable to calling cards), the information is also potentially valuable commercial information which, wholly independent of the unlawful conduct alleged by this lawsuit, could alter defendant AT & T's competitive position in the telecommunications market. Therefore, a protective order will be issued as to Exhibits F and G.

■ As to Exhibits A–D, the Court undertakes a more thorough analysis because of plaintiff's vigorous opposition to the Motion to Seal. Defendants object to the possible dissemination of these documents. The defendants have shown that the "compilation[s] of information" at issue in the present case are used internally and constitute potential negative publicity about its marketing tactics. Internal corporate documents do not automatically merit protective orders, nor is a party entitled under Rule 26(c) to keep documents under seal in order to shield the party from negative publicity. However, defendants' assertion that its competitors who do not now have this information could use it to do competitive injury to the defendants is, on the facts of this case, a sufficient basis to grant defendants' motion to seal at least at this stage of this litigation. As defendants recognize, the exhibits it desires to keep confidential are not "trade secrets" in the traditional sense, but their potential to do commercial harm and the fact that the information—while perhaps not used in the manner alleged by plaintiff—was quite arguably a part of defendant AT & T's efforts to gain competitive advantage are dispositive to the Court's decision to seal the exhibits in question.

For the reasons addressed *infra*, the Court is nonetheless extremely reluctant to grant this Order and therefore the Order may well remain limited in duration. Defendants contend that the Court of Appeals' discussion in *In re "Agent Orange"* of the need for public access was due to the unique public health risk posed by defendant's product. While no such health risk is involved here, the presumption in favor of a public proceeding which exists in all cases is heightened by the public's interest in the behavior of a utility touching the lives of a huge number of people. Moreover, large numbers of people may have been and may still be unknowingly paying to use a service they believe is free. While large sums of money are probably not involved in the cases of most customers, the sum does not alter the principle that everyone has a right to know what they are paying for. The Court's decision on whether to grant a protective order must rest upon balancing defendant AT & T's claim to privacy against the plaintiff class's and the general public's interest in disclosure.

The interest in disclosure is certainly very high in this case. If publicizing the information—even if incomplete and taken out of context—could reveal to many calling card holders, who are not now cognizant that they pay an additional 80 cents per call, the true nature of the rate structure, then such publicity could only be positive. On the other hand, the possibility of commercially damaging exploitation of these internal documents prior to trial is a consideration this Court cannot ignore. The Supreme Court's decision in *Seattle Times v. Rhinehart*, 467 U.S. 20; 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984), dispels this Court's concerns over First Amendment issues.[12] There have been proposals that

---

12. In *Seattle Times,* the Supreme Court upheld a lower court's discretion to issue a protective order as a check on the prevention of abuse that can attend the coerced production of information during discovery, notwithstanding the First Amendment interest prohibiting restraints on free expression. Thus the Court held that where the protective order is limited to the context of pretrial civil discovery and it does not restrict the dissemination of the information if gained

there ought to be a rule of general public access to discovery, but, except perhaps in products liability cases where special considerations may come into play, these proposals have not carried the day. *See* Charles A. Wright & Arthur W. Miller, 8 Federal Practice and Procedure § 2043 Revised Supp.1992; Marcus, *The Discovery Confidentiality Controversy*, 1991 U.Ill. L.Rev. 457, 458.

\* \* \*

The Complaint is dismissed as to defendants Allen and Tanenbaum. Plaintiff's claim brought against defendant AT & T under § 1962(a) of RICO is dismissed. Defendant AT & T's motion to dismiss the federal common law fraud claim and the § 1962(c) RICO claim on the basis of the filed rate doctrine is denied. All of plaintiff's state law fraud claims are dismissed.

Defendants' motion to seal Exhibits A–D and F and G to the Complaint and quotations therefrom in the Amended Complaint and in Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss is granted. The Court's Order sealing Exhibits A–D and F and G will remain in place until such time as plaintiff's Motion for Class Certification is granted, if such Motion is granted, at which time the Court will reconsider its Order to Seal and both parties may renew their arguments in favor of and against the sealing.

The parties are directed to submit an order on notice with respect to implementation of the sealing of the exhibits to the Amended Complaint and quotations therefrom or copies thereof used in other documents submitted by plaintiff and defendants in this action, without unnecessarily sealing entire documents. The order should be submitted to the Court for approval within 14 days of the date of this Memorandum and Order.

Plaintiff is ordered to file his Motion for Class Certification within 60 days of the date of this Memorandum and Order. Until that time, plaintiff and counsel for plaintiff shall continue to have access to all discovered materials, including the sealed documents, for litigation purposes, but the exhibits to be sealed shall not be publicly disseminated.

SO ORDERED.

## MEMORANDUM AND ORDER ON REARGUMENT

Defendants' letter of February 10, 1993 and plaintiff's letter of February 17, 1993 are treated as motions for reargument of the Court's Memorandum of February 8, 1993. Both applications for reargument are denied.

To the extent that the February 8, 1993 Memorandum can be read to suggest that plaintiff asserted a claim against AT & T under 18 U.S.C. § 1962(c), that reading is incorrect. The Court reads the amended complaint to allege an 18 U.S.C. § 1962(c) claim against the individual defendants (including John Doe defendants) only. The fact that information may be uncovered warranting a claim under 18 U.S.C. § 1962(c) against persons whose names are not known at present (the John Doe defendants) is not ground for permitting that claim to stand while the information is sought. Should facts supporting such a claim appear—and can they be stated with adequate particularity—plaintiff may move to amend. The Court does not consider the amended complaint to plead a claim under 18 U.S.C. § 1962(c) against Allen and Tanenbaum with adequate particularity, and "personal awareness of the misleading nature of AT & T's advertising," Letter Feb. 17, 1993 at 1 n. 1, on the part of Mr. Allen does not cure this defect.

SO ORDERED.

from other sources, it does not offend the First Amendment. *Id.* at 34–36, 104 S.Ct. at 2208–09.