445 So.2d 215 (1983)
PROTECTIVE SERVICE LIFE INSURANCE COMPANY
v.
Alvin CARTER, D/B/A Carter Funeral Home and Valley Life Insurance Company.
No. 53968.
Supreme Court of Mississippi.
November 30, 1983.
Rehearing Denied February 15, 1984.
*216 Erwin C. Ward, David M. Robinson, Stennett, Wilkinson & Ward, Jackson, Dewitt Hicks, Gholson, Hicks & Nichols, Columbus, for appellant.
Bennie L. Turner, Walker & Turner, A.M. Edwards, Jr., Edwards, Storey & Helveston, West Point, for appellee.
Before BROOM, P.J., and HAWKINS and DAN M. LEE, JJ.
DAN M. LEE, Justice, for the Court:
This is an appeal from the Chancery Court of Clay County pursuant to Mississippi Code Annotated section 11-1-17 (1972) which allowed an appeal to be taken directly to this Court upon the trial court's failure to enter a final decree within six months after a matter is taken under advisement or deferment. This case was taken under advisement by the chancellor on March 16, 1981, and no final decree was issued. On March 2, 1982, the required filings for an appeal were made by Protective Service Life (PSL), who took the status of an appellant against whom an adverse decree had been rendered. Beall v. Beall, 310 So.2d 706 (Miss. 1975).
On June 2, 1982, this Court decided the case of Glenn v. Herring, 415 So.2d 695 (Miss. 1982), which promulgated Rule 47 of the Supreme Court Rules and abrogated Mississippi Code Annotated section 11-1-17 (1972). Rule 47 replaces the appeal procedure of the statute with the right to apply to this Court for a writ of mandamus to compel a trial judge to render a decision on a matter taken under advisement or deferred. Prior to our ruling in Glenn, the chancellor lost jurisdiction to render a decree in a matter once appeal was perfected pursuant to Mississippi Code Annotated § 11-1-17 (1972). Riley v. Richardson, 258 So.2d 419 (Miss. 1972). This Court has long applied the principle that if there has been a change, alteration or repeal of the law applicable to the rights of the parties, after rendition of the original judgment, and pending the appeal, the case must be heard and decided in the appellate court according to the prior existing law. Musgrove v. Vicksburg and Nashville Railroad Company, 50 Miss. 677, 682 (1874). Therefore we must apply the law as stated in Riley. Doing so, we find first that the chancellor had no jurisdiction to render a decree in this matter. Second, the decree which was entered is simply attached to the record and not a part of it. There being no valid decree, we are not required to find the chancellor manifestly wrong.
We find that Protective Service Life pled tortious interference with a contractual right, not fraud and misrepresentation. Therefore, only a preponderance of the evidence is required to support this cause of action, not clear and convincing evidence as is the standard in cases of fraud. This Court recognizes that a wrongful or a malicious interference with the formation of a contract or the right to pursue a lawful business, calling, trade or occupation, generally constitutes a tort. Irby v. Citizens National Bank of Meridian, 239 Miss. 64, 121 So.2d 118 (1960); Bailey v. Richards, 236 Miss. 523, 111 So.2d 402 (1959). In Irby, this Court quoted 30 Am.Jur. Interference, §§ 43-53, 55, setting forth what was required to show a wrongful or malicious interference with the business relations (contracts) of another:

*217 It is essential both to aver and prove the defendant's knowledge of the contract in question. Such knowledge is not pleaded sufficiently by a mere allegation that he maliciously prevented performance of the contract. A prima facie case of wrongful interference with a contract is made out if it is alleged (1) that the acts were intentional and willful; (2) that they were calculated to cause damage to the plaintiffs in their lawful business; (3) that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); and (4) that actual damage and loss resulted.
239 Miss. at 67, 121 So.2d at 119.
We find that the Irby requirements for proof of malicious interference with business relations of another have been adequately established. Indeed it was stipulated that Carter Funeral Home (CFH) had not complied with Mississippi Insurance Commission's regulation (i.e., Sec. 7, Sub-section 3, infra) governing the replacement of insurance such as we have in this case. The proof is overwhelming that there was tortious interference with appellants (PSL) contractual rights and a finding to the contrary or adversely, would be manifestly wrong.

FACTS
The business or trade in question resulted from a meeting between James F. Robinson, President of PSL, and Alvin Carter, proprietor of Carter Funeral Home (CFH). It was agreed that PSL would underwrite the effort to "build a debit" in the Clay County area around West Point, Mississippi. CFH served primarily the black community of Clay County. The arrangement between PSL and CFH was beneficial to Carter since his funeral home would be named the beneficiary of most of the policies or the proceeds of those policies would be used toward payment of burial services rendered by his funeral home.
PSL desired to have an agent in West Point, Mississippi, who was already a resident there and licensed to sell life insurance. Carter recommended Rev. Henry Gladney to be PSL's general agent in the Clay County area and Carter furnished an office, rent free, in the Carter Funeral Home. Since Rev. Gladney was to be strictly on commission at first, Carter supplemented his salary for the first six months of his employment with PSL.
In order to facilitate sale of the PSL policies in the Clay County black community, CHF agents who were already collecting monthly premiums on Class A burial policies were to ride with PSL agents, show them the debit route, and assist them in their efforts to sell, and, later, collect monthly premiums for PSL. A seminar was held in Houston, Mississippi, at PSL's expense to familiarize Carter and CFH's agents with the PSL policy. No attempt was made to license the CFH agents since they were not to actually write any policies. Carter received no commission from the sale of PSL policies. His benefit was that the insured would name Carter Funeral Home beneficiary of the policy. PSL began selling life insurance in the Clay County area pursuant to the arrangement made between itself and CHF in 1977.
Dr. Lincoln Ragsdale, President of Valley Life Insurance Company (VL) testified that he first met Alvin Carter at a convention in Greenwood, Mississippi, in 1978. Dr. Ragsdale said that he presented a VL policy to Carter at that time for the latter's inspection. On March 23, 1979, Alvin Carter signed a general agency agreement with VL. Dr. Ragsdale acknowledged that he made several trips to Mississippi between March and July of 1979, but he could not specify how many times he might have visited Alvin Carter.
Rev. Henry Gladney, the person recommended by Alvin Carter to serve as PSL's agent in the Clay County area, testified that he was informed by Alvin Carter of a contract which Carter had signed in order to become general agent for VL sometime between March and May, 1979. Rev. Gladney referred in his testimony to meetings where Dr. Lincoln Ragsdale and Alvin Carter *218 discussed the sale of VL policies. At one such meeting Rev. Gladney agreed to write insurance for VL on commission so long as the work did not interfere with PSL policies already in force. Later, Dr. Ragsdale, Alvin Carter, Tommy Free and Rev. Gladney met at Carter Funeral Home to discuss slowly switching over all PSL policies to VL policies. They decided this could best be accomplished by allowing the PSL policies to lapse because lapsed business would be anyone's and would not require notice to PSL. Rev. Gladney stated that he objected because the plan was not legal but was assured by Dr. Ragsdale that it would be all right if the plan were carried out slowly. Alvin Carter was said to have stated that his attorneys had advised him that if a customer chose to purchase one policy and cancel another, then there was nothing anyone could do about it. It was agreed at that time that Rev. Gladney would not participate in the plan.
Between July and September of 1979, Alvin Carter and Several CFH agents obtained life insurance licenses. Marilyn Bell, secretary and bookkeeper for CFH, testified that she had obtained a license to sell life insurance in July of 1979. In her deposition which she acknowledged, she stated that she transferred several policies from PSL to VL upon direction of Alvin Carter and Dr. Ragsdale. She recalled seeing Dr. Ragsdale at CFH's offices several times in early 1979.
Lou Birda Box, a resident of West Point, Mississippi, testified that her PSL policy was changed to a VL policy. She stated that a Mrs. Drane, an agent for CFH came to her home and took her PSL policy away. This was later replaced by a VL policy. She stated that Rev. Gladney continued to collect the monthly premium for this policy.
Rev. Gladney testified that delinquent accounts began to appear in October, 1979, and that there was a dramatic increase in delinquencies between that time and February, 1980. He also described a part of the plan outlined by Dr. Ragsdale to encourage PSL policy holders to "switch-over" voluntarily to VL policies since this would look better from a legal standpoint. It appears that this plan resulted in some of the delinquencies referred to by Rev. Gladney.
It also appears that some of the accounts became delinquent because of a delay in sending premium payments from the point of collection at Carter Funeral Home to PSL in Jackson, Mississippi. There was no explanation in the record as to why these premium payments were held by Carter Funeral Home. Though PSL agents who came to investigate the sudden lapse of so many PSL policies did instruct Alvin Carter, Mrs. Bell and others to no longer send premium payments to Rev. Gladney, the record shows that this instruction was not given until February, 1980. The premium payments found to be held by Carter Funeral Home were made prior to that time. The record also shows that upon audit of Rev. Gladney's record by PSL's agents, approximately $1900.00 in premiums had been paid by the policyholders but not forwarded to PSL. The entire amount was turned over to PSL agents over a period of two weeks by Carter Funeral Home.
There was testimony which shows that there was hostility between PSL's agents and Alvin Carter. It is not contradicted that Carter threatened to have the PSL agents arrested if they tried to speak with policyholders in the community in order to ascertain the reason why their policies lapsed even though they had paid their premiums. Once the automatic lapse notices from PSL had issued in the community for non-payment of premiums, Alvin Carter went on his weekly radio broadcast to disavow his association with PSL, causing further confusion.
There was testimony by several witnesses who were confused as to what was going on at the time and who either allowed their PSL policies to be changed to VL policies or did not question the process for fear that they were no longer covered by the PSL policy for future funeral services to be rendered by Alvin Carter and CFH.
Unfair competition practices in the insurance industry are regulated by the *219 Commissioner of Insurance in Mississippi. Mississippi Code Annotated section 83-5-33 (1972). The unfair competition practice in question in this case is referred to as "twisting" in insurance vernacular. The Blacks Law Dictionary, 5th Ed. defines the term as follows:
Colloquially, in insurance, the misrepresentation or misstatements of fact or incomplete comparison of policies to induce the insured to give up a policy in one company for the purpose of taking insurance in another.
Mississippi Code Annotated section 83-5-35(a) (1972) states in its final clause, "[M]aking any misrepresentation to any policyholder insured in any company for the purpose of inducing or tending to induce such policyholder to lapse, forfeit, or surrender his insurance" is an unfair trade practice. If such an unfair competitive practice is found to have occurred, Mississippi Code Annotated section 83-5-37 (1972) says that the Commissioner of Insurance shall have the power to examine and investigate into the affairs of every person engaged in the business of insurance in this state in order to determine whether such person has been or is engaged in any unfair method of competition or in any unfair or deceptive act. There is no provision in the statutes for a cause of action or damages based upon this type of activity. Instead, the cause of action arises in common law. The right of one to benefit from his contractual arrangements is a property right which shall be protected. Cranford v. Shelton, 378 So.2d 652 (Miss. 1980); Southwest Drug Co. v. Howard Bros. Pharmacy, 320 So.2d 776 (Miss. 1975).
The Mississippi Insurance Commission has promulgated regulations covering the activities of insurance agencies. Of particular importance to the case at bar is the Life Insurance Replacement Regulation. That regulation reads in part as follows:
Section 3, Definition of Replacement

"Replacement" means any transaction in which new life insurance, including annuity contracts, is to be purchased, and it is known or should be known to the proposing agent, or to the proposing insurer if there is no agent, that by reason of such transaction existing life insurance has been or is to be:
(A) Lapsed, forfeited, surrendered or otherwise terminated; ...
* * * * * *
Section 6, Duties of Agents

(A) Each agent shall submit to the replacing insurer with or as part of each application for life insurance:
(1) A statement signed by the applicant as to whether or not such insurance will replace existing life insurance; and
(2) A signed statement as to whether or not the agent knows replacement is or may be involved in the transaction.
* * * * * *
Section 7, Duties of Replacing Insurers

Each replacing insurer shall:
(A) Inform its field representatives of the requirements of this regulation;
(B) Require with or as part of each completed application for life insurance: (1) a statement signed by the applicant as to whether or not such insurance will replace existing life insurance; and
(2) A statement signed by the agent as to whether or not he or she knows replacement is or may be involved in the transaction.
(C) Where a replacement is involved:
* * * * * *
(3) Send to the existing insurer a written communication that includes the name of the insured and the identification information with respect to the existing life insurance to be replaced that it obtained pursuant to section 7(C)(1) within five working days of the date the application is received at its home or regional office, or the date its policy is issued, whichever is sooner.
Mississippi Insurance Commission Reg. 81-001.
It does not appear from the record that this regulation was complied with by Alvin Carter or any of his agents at the time VL *220 policies were written. Dr. Lincoln Rangsdale testified that he had no idea the regulation existed. It is clear that no notice was given PSL by Alvin Carter or VL that the latter was replacing PSL policies with VL policies. It also plainly appears from the exhibits accompanying this record that information found on PSL policies was copied verbatim onto VL policies. This resulted in some policyholders being listed as the same age on their VL policy as they were on their PSL policy, regardless of the fact that the VL policy was purchased from two to three years later. Carter Funeral Home and VL agree on appeal that PSL had adequately shown (1) that there were wrong ages of insureds on VL policies, (2) no notice was sent to PSL as required by the insurance regulation and (3) VL's and CFH's agents did not tell PSL policyholders above vested rights in their PSL policies. It is their contention that these facts do not in and of themselves constitute fraud and misrepresentation required for proof of "twisting." As stated before, fraud and misrepresentation are not the issue in this case.
We find that the evidence amply supports a finding of liability. Indeed appellees stipulated that the insurance regulation governing insurance (Sec. (7) sub-section (3), supra) was violated.
On the measure of damages, however, from this record it appears that Carter might very well have accomplished the same result in a few months time by employing perfectly lawful means. Whether PSL had any business in the West Point  Houston area seems to have been almost totally dependent on the will and pleasure of Carter.
Upon retrial the parties may fully develop what damages should be allowed under well established principles of proving damages.
We, therefore, reverse and render on liability and remand this cause for a determination of damages.
REVERSED AND REMANDED.
PATTERSON, C.J., WALKER and BROOM, P.JJ., and BOWLING, HAWKINS and ROBERTSON, JJ., concur.
ROY NOBLE LEE and PRATHER, JJ., not participating.