## IN THE SUPREME COURT OF MISSISSIPPI

### NO. 1999-CA-00523-SCT

*AMERICAN BANKERS' INSURANCE COMPANY OF FLORIDA, FIDELITY FINANCIAL SERVICES, INC. AND*

*FIDELITY ACCEPTANCE CORPORATION*

*v.*

*LINDA M. WELLS AND JAMES E. OLIVER*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/10/1999 |
| TRIAL JUDGE: | HON. LAMAR PICKARD |
| COURT FROM WHICH APPEALED: | CLAIBORNE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | W. SCOTT WELCH, III |
| | ROBERT M. FREY |
| | FRANKLIN G. BURT |
| | ROLAND C. GOSS |
| | CHARLES E. GRIFFIN |
| | JAMES W. CRAIG |
| | ROSS F. BASS, JR. |
| | WILLIAM C. BRABEC |
| ATTORNEYS FOR APPELLEES: | WILLIAM R. COUCH |
| | JOHN M. DEAKLE |
| | FORREST MARVIN MORRIS, III |
| | ANTHONY SAKALARIOS |
| | JOHN MICHAEL SIMS |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART - 12/06/2001 |
| MOTION FOR REHEARING FILED: | 12/20/2001; denied 3/7/2002 |
| MANDATE ISSUED: | 3/14/2002 |

**EN BANC.**

**WALLER, JUSTICE, FOR THE COURT:**

¶1. Fidelity Financial Services, Inc.[1] is in the business of providing consumer loans. It financed the purchase of automobiles by both Linda M. Wells and James E. Oliver. Fidelity required both Wells and Oliver to obtain and maintain insurance to protect Fidelity's security interest in the automobiles. Under the terms of the security agreement, if the automobile became uninsured during the life of the promissory note, Fidelity had the right to purchase collateral protection insurance ("CPI") at a rate which is subject to approval by the State Department of Insurance. After the insurance was canceled on Wells's and Oliver's automobiles, Fidelity purchased CPI from American Bankers' Insurance Company of Florida. Claiming that Fidelity and American Bankers conducted business improperly, including charging an excessive rate for the CPI, Wells and Oliver filed suit in the Circuit Court of Claiborne County, and following a jury trial, were awarded judgments of $100,000 and $125,187.50, respectively, in compensatory damages and $75,000 each in punitive damages.

¶2. American Bankers, Fidelity Financial and Fidelity Acceptance Corporation appeal from the judgments in favor of Wells and Oliver. The appeal raises issues including whether: Wells's and Oliver's claims are barred by the statute of limitations, a claim for excessive premiums is barred by the filed rate doctrine, a claim for tortious conduct in the performance of a contract should fall under the purview of the Department of Insurance or in the courts of this State, Fidelity and American Bankers owed Wells and Oliver a fiduciary duty or the duty of good faith and fair dealing, Fidelity and American Bankers engaged in fraudulent behavior, and Wells and Oliver may recover for emotional distress.

¶3. We affirm in part, reverse and remand in part, and reverse and render in part.

## FACTS

¶4. On June 4, 1990, Wells purchased a 1989 Subaru automobile for $7,791, financing the purchase with a 36-month loan from Fidelity. Wells's insurance was cancelled for failure to pay the premiums, and she received notice in August 1992 that Fidelity had placed CPI on her car. Faced with higher insurance rates than she had been paying, Wells purchased her own insurance coverage, whereupon the CPI purchased by Fidelity was canceled.

¶5. On June 7, 1993, James Oliver purchased a 1992 Ford Explorer and financed the purchase with a loan from Fidelity. The loan agreement similarly required insurance to be maintained against loss:

> Insurance: The Collateral shall be at my risk. I agree that I will keep the Collateral insured at my expense against fire, theft, and accidental physical damage, until such time as my obligations secured by this security agreement are fully paid. . . . [I]n the event I fail to keep the Collateral insured you may purchase insurance, although you do not have a duty to do so. You may purchase vendor's single interest coverage protecting your interest only. Any sums paid by you for insurance, or paid with respect to any taxes or liens on any Collateral, shall be repaid by me to you upon your demand, or may be added to the unpaid Principal Balance of my loan.

¶6. Fidelity force-placed insurance on Oliver's automobile on two occasions. First, Fidelity placed CPI on Oliver's car for the period from November 1, 1993, to November 1, 1994. This policy was canceled prior to November 1, 1994, however, when Oliver presented proof that he had purchased his own insurance. Second, Fidelity placed CPI on Oliver's car for the period December 25, 1994, to March 3, 1995. This insurance, which was not placed until April, 1995, was canceled as of March 3, 1995, when Oliver provided proof of his own insurance.

¶7. Fidelity contracted with American Bankers for the CPI covering Fidelity's interest in the vehicles belonging to Wells and Oliver. On July 15, 1998, Wells and Oliver filed separate yet identical complaints against Fidelity and American Bankers, alleging breach of contract, bad faith, breach of fiduciary duties, fraud, civil conspiracy, negligence, and conduct warranting the imposition of punitive damages. The plaintiffs alleged that Fidelity and American Bankers had improperly used the opportunity of the plaintiffs' default to secure a profit for themselves. Specifically, they alleged that the defendants had charged excessive premiums for the CPI and had engaged in other allegedly fraudulent and inequitable conduct.

¶8. The jury trial of Wells and Oliver's consolidated claims began on February 1, 1999, and the jury returned a general verdict awarding compensatory damages of $100,000 in favor of Wells and $125,187.50 in favor of Oliver against Fidelity and American Bankers, jointly and severally. In the punitive damages phase of the trial, the jury awarded Wells and Oliver punitive damages in the total amount of $75,000 each: $25,000 against each of the two Fidelity defendants and $25,000 against American Bankers. Judgment was entered on February 10, 1999, and American Bankers and Fidelity, feeling aggrieved, timely appealed to this Court.

## ANALYSIS

### I. WHETHER THE TRIAL COURT ERRED IN FAILING TO DISMISS WELLS'S AND OLIVER'S CLAIMS AS BARRED BY THE APPLICABLE STATUTE OF LIMITATIONS.

¶9. Fidelity and American Bankers first argue on appeal that Wells's and Oliver's claims for breach of the implied covenant of good faith and fair dealing, breach of fiduciary duties, fraud, conspiracy, and punitive damages are barred by the statute of limitations. Wells and Oliver do not dispute that the three-year statute of limitations in Miss. Code Ann. § 15-1-49 (1995) is applicable to all of these causes of action. *Levens v. Campbell*, 733 So. 2d 753, 758 (Miss. 1999); *Trammell v. State*, 622 So. 2d 1257, 1261 (Miss. 1993) (tort actions arising from contractual obligations controlled by § 15-1-49). Both of the complaints were filed on July 15, 1998. Therefore, barring some applicable exception to the three-year statute of limitations, Wells and Oliver must demonstrate that their causes of action accrued on or after July 15, 1995.

¶10. Wells and Oliver advance a number of arguments for the tolling of the statute of limitations, the most persuasive of which involves tortious conduct in the force-placement of insurance reported in the case of *Wells v. First Am. Bank West*, 598 N.W.2d 834 (N.D. 1999), in which the North Dakota Supreme Court, in reversing a dismissal by a lower court, held that the discovery rule tolled the running of the statute of limitations in a claim involving allegations of tortious conduct in the force-placement of CPI, as follows:

> The district court ruled very narrowly. Applying the discovery rule, the placement of the policy could trigger the statute of limitations if Wells knew, or should have known, of the excess coverage that is the basis of his breach of contract and fraud claims. The court did not apply the discovery rule, and notwithstanding Wells's admission that the claim would be barred if the placement of the policy were dispositive, the placement of the policy is not dispositive in this case. There is no mention in the memorandum opinion regarding discovery or what Wells actually knew or should have known regarding when the insurance was force placed. We believe reasonable minds could disagree upon when Wells knew or should have known about his claims for breach of contract and fraud. Therefore, without findings regarding what Wells knew or should have known, designating the time of placement

of the policy as the trigger for the statute of limitations was in error.

*Id.* at 839-40.

¶11. The North Dakota Supreme Court did not consider dispositive the fact that the plaintiff in that case had learned that insurance had been force-placed in 1990. The court instead noted that the plaintiff's contention was that the lender had force-placed insurance in excess of that permitted under the loan contract. *Id.* It concluded that the plaintiff did not learn of that *excess* force-placement until 1997 and held this date to be controlling for purposes of the discovery rule:

> The relevant question is when did Wells discover he had a potential cause of action against the insurance company. When Wells purchased the vehicle, the agreement called for force placed insurance to protect the bank's interest in the property. When Wells failed to insure the vehicle, he received a letter informing him insurance was being purchased and the cost added to his loan. Wells, however, argues the force placed insurance exceeded his obligation under the terms of his loan agreement. He argues he was never told of the excess insurance, and the November 16, 1990, letter from First American stated the excess coverage was for "collision and comprehensive coverage only."

*Id.* at 838-39.

¶12. In the present case, allegations similar to those made by the plaintiff in the North Dakota case have been made: that (a) Fidelity backdated its policies; (b) the vehicles would have to be repossessed in order for the force-placed policy to pay any amount whatsoever or before a claim could be made; and (c) the insurance that was force-placed was based upon a gross over time balance of the loan as opposed to the net payoff of the loan. The issue thus becomes whether a reasonable person similarly situated to Wells or Oliver would have discovered these potential claims.

### A. Backdating Policies.

#### i. Rights Under the Security Agreements.

¶13. Under the Security Agreements, Fidelity may not have had the right to backdate the force-placement of coverage. Wells's Promissory Note stated:

> I [Wells] will keep the security insured against loss by fire, theft and collision in case of motor vehicles, and against loss by fire for other security. If I do not I am in default, or at your [Fidelity] option, you may advance the premium on required or authorized insurance. The advance will become a part of the Note, and will be secured by the Security Agreement, and will bear interest at the Agreed Rate of Charge provided for in the Note.

Wells signed the Promissory Note on the date she acquired her vehicle, and presumably she was given a copy of the same.

¶14. Oliver's Promissory Note stated as follows:

> The Collateral shall be at my [Oliver's] risk. I agree that I will keep the Collateral insured at my expense against the theft and accidental physical damages until such time as my obligations secured by this Security Agreement are fully paid. . . . In the event I fail to keep the Collateral insured, you

[Fidelity] may purchase insurance, although you do not have a duty to do so.

¶15. Nowhere in these documents is Fidelity given the right to backdate the force-placement of insurance coverage. Fidelity was given the right or option to force-place insurance under the Security Agreements, but since Fidelity documents are silent as to what the effective date of force-placed coverage should be, a reasonable person could logically assume that the force-placed coverage would start from the date of the force-placement, as opposed to the date of the lapse of insurance. As Fidelity controlled the language of the Security Agreements, we necessarily interpret them to benefit Wells and Oliver and against Fidelity. ***State Farm Mut. Auto. Ins. Co. v. Latham***, 249 So. 2d 375, 378 (Miss. 1971); ***Griffin v. Maryland Cas. Co.***, 213 Miss. 624, 57 So. 2d 486 (1952); ***Claxton v. Fidelity & Guar. Fire Corp.***, 179 Miss. 556, 175 So. 210 (1937).

## ii. Notice of Backdating to Wells.

¶16. While Wells was testifying, defense counsel asked her to read from Exhibit D1-16. Unfortunately, this exhibit is not included in the record. However, Wells agreed that the exhibit was dated August 21, 1992, and that it stated that the force-placed coverage was effective from June 9, 1992, to June 9, 1993. If Wells received this document from Fidelity, it would have constituted reasonable notice to her that the coverage had been backdated. However, Wells never stated on the record whether she received it. In fact, she denied ever receiving any documentation from Fidelity. We can only conclude that Wells never received any notice of the backdating of the force-placement.

¶17. We therefore find that the trial court did not err in denying the motion to dismiss Wells's claim for backdating because she never received reasonable notice of the backdating and the statute of limitations never began to run until, presumably, documents were produced during discovery.

## iii. Notice of Backdating to Oliver.

¶18. As stated previously, Fidelity force-placed insurance on Oliver's automobile on two occasions, one from November 1993, to November, 1994, and one from December, 1994, to March, 1995. Each time coverage was force-placed, within weeks thereof, Oliver received Certificates of Insurance from Fidelity. Each of the certificates clearly specifies the term of the coverage. We find that the Certificates of Insurance gave adequate notice of the backdating and that a reasonable person would have known of the backdating at the time of the receipt of the Certificates. We find that the trial court should have granted the motion to dismiss Oliver's claim for backdating because he received reasonable notice of the backdating and the statute of limitations began to run as early as December, 1993, when he received the Certificate of Insurance for the first force-placement, and as late as February, 1995, when he received the Certificate of Insurance for the second force-placement.

## B. Repossession.

¶19. Wells and Oliver claim that they were injured by the force-placement of insurance because, before a claim could be made or before any payment of a claim could issue, the vehicle would have had to have been repossessed by Fidelity. Neither Wells nor Oliver has standing to make this claim because their vehicles were not damaged in any way during the period the force-placed coverage was in effect. Oliver's vehicle was damaged when *no* insurance, obtained personally or from Fidelity, was in effect, and he admitted that he had never filed a claim for that accident with Fidelity. The trial court therefore erred by

denying Fidelity's motion for directed verdict on these claims.

## C. Accounting Method Used to Impose Premiums.

¶20. We find that no notice was given to either Wells or Oliver that the force-placed insurance premiums were added to the balance of the loan using the gross over time method vs. net payoff method. Therefore, the statute of limitations never began to run until, presumably, documents were produced during discovery.

### i. Notice of Accounting Method Used to Calculate Wells's Payments.

¶21. There was no proof at trial of which accounting method was used for the imposition of premiums on Wells's loan. There is practically no documentation from Wells's Fidelity account file, and there was no testimony concerning which accounting method was used for Wells's account. As the burden was on the plaintiffs to prove this allegation by a preponderance of the evidence, the trial court erred in denying Fidelity's motion for directed verdict insofar as Wells's accounting method claim is concerned. *Fayard v. Louisville & N.R. Co.*, 210 Miss. 1, 48 So. 2d 133, 135 (1950).

### ii. Notice of Accounting Method Used to Calculate Oliver's Payments.

¶22. The only proof as to the accounting method used was during the plaintiffs' cross-examination of Jim McCrory, a Fidelity executive, when he was asked about Oliver's Fidelity account:

> Q. Okay. '95. Now, what is the gross balance [on Oliver's account] as of that date?
>
> A. As of April 8th of 1995, the gross balance on his account is $15,177.77.
>
> Q. Okay. So from looking at this, isn't it true, sir, that the insurance that would cover Mr. Oliver at that time was on the gross balance and not his payoff, right?
>
> A. It states there the outstanding balance at the time of inception was $15,132, yes, sir.
>
> Q. And according to your ledger, that is the gross balance and not the payoff, right?
>
> A. That was the alance at the time, right.

Plaintiffs therefore met their burden of proof that the gross over time method was used for Oliver's account. Therefore, the trial court did not err in denying the motions to dismiss Oliver's claim because Oliver never received reasonable notice of the accounting method used and the statute of limitations never began to run until, presumably, documents were produced during discovery.

## II. WHETHER WELLS'S AND OLIVER'S CLAIMS ARE BARRED BY THE FILED RATE DOCTRINE.

¶23. Fidelity and American Bankers next argue that the allegations in Wells's and Oliver's complaints are barred by the filed rate doctrine. Under the filed rate doctrine, any "filed rate" -- that is, a rate approved by the governing regulatory agency -- is "per se reasonable and unassailable in judicial proceedings brought by ratepayers." *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994); *United Gas Pipe Line Co. v. Willmut Gas & Oil Co.*, 231 Miss. 700, 718, 97 So. 2d 530, 535 (1957) (petitioner "can claim no rate as a legal right that is other than the filed rate, whether fixed or merely accepted by the Commission,

and not even a court can authorize commerce in the commodity on other terms") (quoting *Montana-Dakota Utils. Co. v. Northwestern Pub. Serv. Comm'n*, 341 U.S. 246, 251, 71 S. Ct. 692, 695, 95 L. Ed. 912 (1951)).

¶24. The filed rate doctrine is based upon sound considerations of law and judicial policy. A civil juror, who likely has little, if any, expertise in the area of insurance rates and policies, should not be permitted to reject and thereupon impose liability based on the rates of a policy which was expressly approved by the Department of Insurance. *See* Miss. Code Ann. §§ 83-1-1 et seq. (1999). Permitting a jury to impose liability in such circumstances would result in a judicial infringement upon the duties and responsibilities which are expressly delegated by the Legislature to the Department of Insurance. *Id.*

¶25. A plaintiff might have a valid cause of action against his lender for a breach of the duty of good faith and fair dealing if it could be shown that the lender engaged in bad faith conduct in the *performance* of a contract approved by the Department of Insurance, rather than in the actual rates of such a policy. However, one of the central allegations of this action is that Fidelity obtained a CPI policy under which the rates were too high and the provisions were slanted in favor of Fidelity. Clearly, Wells and Oliver would have claimed less damages if the CPI policy contained lower rates, but the Department of Insurance, in the exercise of its discretion, opted to approve the rates and policy in question.

¶26. Wells and Oliver allege that the "actual monetary damages" were $2,700 for Oliver and $350 for Wells. These sums coincidentally closely parallel the rates charged for the CPI policies in question. They further allege that there is nothing in the loan documents which would have in any way alerted either them to the fact that the premiums charged for the insurance coverage force placed by American Bankers and Fidelity were excessive, and that they exceeded their own filed rates. The complaints therefore clearly contain claims that the rates in the CPI policy approved by the Insurance Department were "excessive."

¶27. At the same time, the complaints do contain some allegations which arguably fall outside of the scope of the filed rate doctrine, including the claims that Fidelity and American Bankers should be held liable for:

(A) Illegally backdating worthless insurance coverage on Fidelity borrowers for the sole purpose of garnering extra unearned premiums for up to six months during which time Fidelity could never have filed a claim under the policies force placed on the Wells and Oliver loans because their vehicles were never damaged or repossessed (conditions precedent to a claim being made by Fidelity).

(B) Charging Fidelity customers insurance premiums based upon the gross amount of the loan (gross balance) as opposed to the net payoff of the loan on the date of force placement or the actual cash value of the vehicle (net balance) when the American Bankers policy would never pay more than the net balance of the loan thereby allowing American Bankers and Fidelity to charge premiums for phantom coverage.

(C) Requiring that the borrowers' vehicles (which served as collateral for the Fidelity loans) be repossessed before the vehicle could be repaired and before a claim could even be made. Moreover, the customer could never get the car back after it was repossessed.

(D) Committing fraud in connection with their own filed rates and/or exceeding what was allowed to be charged under their own filed rates by:

1. Basing premiums on eighteen months rather than twelve months in order to charge additional

premiums; and

2. By adding a forty-five percent surcharge to premiums when their own actuary stated that this charge was not based upon any objective underwriting criteria.

¶28. Although some jurisdictions have recognized exceptions to the filed rate doctrine, the acceptance of the doctrine's basic applicability is near-universal. At the same time, Wells and Oliver do make allegations which are arguably outside of the scope of the filed rate doctrine.

¶29. We remand this case to the trial court for a new trial with directions that Wells and Oliver be limited to recovery for damages (if any) resulting from tortious conduct in the *performance*, rather than the rates and terms, of the contract in question.[2] The trial judge should also be careful, however, to prevent the jury from imposing liability based upon the rates of the policies in question which are subject to oversight by the Department of Insurance in the exercise of its statutory mandate. We are required to give judicial deference to the jurisdiction and authority granted to a governmental agency by the Legislature.

### III. WHETHER FIDELITY OR AMERICAN BANKERS MAY BE HELD LIABLE FOR A BREACH OF FIDUCIARY DUTY.

¶30. Fidelity and American Bankers next argue that the trial court erred in refusing to enter a directed verdict on Wells's and Oliver's claims of breach of fiduciary duty. We find that a fiduciary relationship between a lender and a borrower does not arise when the lender breaches the lending contract. Indeed, in *General Motors Acceptance Corp. v. Baymon*, 732 So. 2d 262 (Miss. 1999), we rejected arguments that a lender who had obtained CPI under circumstances similar to those in the present case owed a fiduciary duty to the borrower. We held:

> Baymon is unable to demonstrate that her relationship with GMAC was fiduciary in nature. There is no evidence in the record that GMAC created an expectation in Baymon that it would protect her interests, nor that she was lulled into a false sense of security by relying on GMAC. Indeed, GMAC's repeated warnings that CPI might not fully protect Baymon's interests clearly prevented any fiduciary expectations on her part. As a result, this Court finds that no fiduciary relationship existed between GMAC and Baymon.

*Id.* at 270. Based on *Baymon*, there is no basis on which we might hold that Fidelity owed Wells or Oliver a fiduciary duty.

¶31. There is even less reason to conclude that American Bankers might owe a fiduciary duty to Fidelity's borrowers. American Bankers had no contractual relationship with Fidelity's borrowers, and the American Bankers CPI policy in question served only to protect Fidelity's interest in the collateral. Wells and Oliver cite no authority holding that a collateral protection insurer owes a fiduciary duty to borrowers with whom it has no contractual relationship; therefore, they failed to establish a cause of action against American Bankers for breach of fiduciary duty.

### IV. BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING.

¶32. Fidelity and American Bankers also argue that *Baymon* precludes any recovery by Wells or Oliver for a breach of the duty of good faith and fair dealing. In *Baymon*, we held as follows:

Concerning the implied duty of good faith and fair dealing we held in *Cenac* that "[a]ll contracts contain an implied covenant of good faith and fair dealing in performance and enforcement." *Cenac v. Murry*, 609 So. 2d 1257, 1272 (Miss. 1992) (citing *Morris v. Macione,* 546 So.2d 969, 971 (Miss. 1989)). "The breach of good faith is bad faith characterized by some conduct which violates standards of decency, fairness or reasonableness." *Id.* (citing Restatement (Second) of Contracts § 205, 100 (1979)). However, in performing a contract, the parties are not prevented from "protecting their respective economic interests" or from asserting their rights in the event of a default. *Merchants & Planters Bank of Raymond v. Williamson*, 691 So. 2d 398, 405 (Miss. 1997).

The record does not reflect that GMAC violated any of its duties of good faith and fair dealing toward Baymon. When Baymon defaulted on her obligation to maintain auto insurance, GMAC took only those actions which were duly authorized by the contract. GMAC repeatedly notified Baymon that she was violating her agreement and gave her several opportunities to remedy her breach. On the contrary, GMAC's decision to purchase CPI instead of repossessing Baymon's car allowed her the continued benefit of her car. Therefore, this Court holds that GMAC did not breach its implied duty of fair dealing and good faith under the contract.

*Baymon*, 732 So.2d at 269.

¶33. The issue thus arises as to whether Fidelity's or American Bankers' conduct can be distinguished from that of the defendants in *Baymon*. We find that the proof against Fidelity was sufficient to put the issue of any breach of the duty of good faith and fair dealing by Fidelity before a jury.

¶34. Wells and Oliver elicited testimony from a Fidelity employee that could lead a reasonable finder of fact to conclude that Fidelity had engaged in conduct which is violative of the duty of good faith and fair dealing. Jim McCrory, Fidelity's branch manager from Jackson, testified that the letters sent on Fidelity letterhead provided that the CPI should be based on the net, rather than the gross, balance of the loan. McCrory testified as follows regarding the effect of placing the insurance on the gross, as opposed to the net balance:

Q: Yes, sir. And if you bought insurance on the unpaid balance, it would cost you less than buying insurance on the gross balance, wouldn't it?

A: Yes, sir, you would be paying on a different amount.

Q: So if you charge people on the gross balance as opposed to the net balance, that's another way you can make extra money, isn't it?

A: If that were happening, that would be true, yes sir.

During cross-examination, plaintiffs' counsel showed McCrory a second letter from Fidelity which specifically provided that the premium would be calculated on the net balance of the account or the actual cash value of the vehicle, whichever is less. McCrory testified as follows:

Q. If you are going to sell insurance that's only going to pay the net balance of the actual cash value of the vehicle, Mr. McCrory, can you ever think of any justification whatsoever if you're going to treat your customers fair to charge them a premium based upon the gross balance of the note?

A. No, if it were stated - - with the letter the way it is, it should not be calculated.

We therefore conclude that Wells and Oliver did establish a jury issue as to whether Fidelity breached the duty of good faith and fair dealing.

¶35. Wells and Oliver, however, did not establish that American Bankers, which had no contract with them, should be held liable for a breach of the duty of good faith and fair dealing. The duty of good faith and fair dealing arises from the existence of a *contract* between parties. *See Cenac*, 609 So. 2d at 1272. Fidelity contracted with Wells and Oliver and the contract permitted Fidelity to obtain CPI in the event they failed to maintain insurance covering their vehicles.

¶36. American Bankers contracted with Fidelity to insure the interest in the vehicle of Fidelity, not the plaintiffs. Wells and Oliver cite no authority holding that an insurer similarly situated to American Bankers owes a duty of good faith and fair dealing to borrowers similarly situated to Wells and Oliver.

¶37. The evidence of unfair and inequitable conduct as it relates to American Bankers is insufficient to support recovery, given the lack of any contractual relationship between American Bankers and Wells or Oliver, and these claims are dismissed. The trial court's denial of Fidelity's motion for directed verdict as to Fidelity's alleged breach of the duty of good faith and fair dealing to Wells and Oliver is affirmed.

## V. WHETHER FIDELITY OR AMERICAN BANKERS MAY BE HELD LIABLE FOR FRAUD OR CIVIL CONSPIRACY.

¶38. Fidelity and American Bankers next argue that Wells and Oliver failed to establish fraud. A successful claim of fraud requires proof of: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the hearer in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) reliance on its truth; (8) right to rely thereon; and (9) consequent and proximate injury. *Franklin v. Lovitt Equip. Co.*, 420 So. 2d 1370, 1373 (Miss. 1982).

¶39. Wells and Oliver have failed to demonstrate any affirmative representation made by either Fidelity or American Bankers which induced their justifiable reliance thereon. As discussed in the point of error regarding concealment fraud, there were doubtlessly aspects of the relationship between American Bankers and Fidelity which were not apparent to Wells or Oliver. However, they are unable to demonstrate any specific representation by Fidelity or American Bankers which might give rise to a fraud cause of action. We concluded in *Baymon* that the plaintiffs there had failed to establish a cause of action for fraud, and we so find in the present case. *Baymon*, 732 So. 2d at 269-70.

## VI. WHETHER WELLS AND OLIVER ARE ENTITLED TO AN AWARD OF COMPENSATORY DAMAGES FOR "EMOTIONAL DISTRESS" OR PUNITIVE DAMAGES.

### A. Emotional Distress.

¶40. Fidelity and American Bankers next argue that Wells and Oliver failed to establish a right to recover damages for emotional distress, given the lack of any physical injury on their part. We have usually followed the majority view that, in order to recover for mental anguish unaccompanied by demonstrable physical or mental injury, the defendant's conduct must be malicious, intentional, willful, wanton, grossly careless, indifferent or reckless. *Mississippi Valley Gas Co. v. Walker*, 725 So. 2d 139, 148 (Miss. 1998);

*Morrison v. Means*, 680 So. 2d 803, 806 (Miss. 1996). In these cases, where the defendant's conduct rises only to the level of ordinary negligence, the plaintiff must prove some sort of injury or demonstrable harm, whether it be physical or mental, and that harm must have been reasonably foreseeable to the defendant. *Walker*, 725 So. 2d at 148; *Morrison*, 680 So. 2d at 805 n.1.

¶41. In another line of cases, we have demonstrated an intent to "relax" the standard of proof in emotional distress cases and follow the minority view that a plaintiff may recover for emotional distress and mental anguish proximately resulting from ordinary negligence, provided only that the injury was reasonably foreseeable by the defendant. *Southwest Miss. Reg'l Med. Ctr. v. Lawrence*, 684 So. 2d 1257, 1269 (Miss. 1996); *Universal Life Ins. Co. v. Veasley*, 610 So. 2d 290, 295 (Miss. 1992); *Strickland v. Rossini*, 589 So. 2d 1268, 1275 (Miss. 1991). Even in this more permissive line of cases we have required a heavy burden of proof in order to establish a right to recover emotional distress damages.

¶42. In *Adams v. U.S. Homecrafters, Inc.*, 744 So. 2d 736 (Miss. 1999), for example, we endorsed the more permissive minority view, but nevertheless held that the plaintiffs had failed to have met their burden of proof in this regard through her testimony as to her mental distress. A plaintiff testified as follows:

> A. It's been a total nightmare. I mean, I've stayed up for days and I've stayed up for nights just hoping water wouldn't get in my porch. I have been out there the middle of the nighttime making sure, and I have dug it out in the middle of the nighttime just to keep water out of the house because I just couldn't get no help.
>
> Q. What do you do when you're at work and it rains?
>
> A. Worry real bad. Sometimes I leave work and go check real quick because I don't work because I don't work but -- I guess it's about a half a mile from my house.

*Id.*, at 743-44. We held this testimony to be insufficient even under the more permissive line of cases, stating:

> The evidence presented here is similar to that in both *Morrison v. Means* and *Strickland v. Rossini*, wherein the plaintiffs complained of worry or emotional upset and loss of sleep. *Morrison*, 680 So. 2d at 807; *Strickland*, 589 So. 2d at 1275-76. We found that this was insufficient evidence to support an award for emotional distress. . . . We find that Mr. Adams's vague testimony about loss of sleep and worry caused by the drainage problem was insufficient to support an instruction or award of damages for emotional distress in this case.

*Id.*

¶43. We have applied the line of cases adopting the more restrictive majority view in the most recent holdings on this issue, although the cases applying the minority view have not been overruled. *See Summers ex rel. Dawson v. St. Andrew's Episcopal Sch., Inc.*, 759 So. 2d 1203, 1211-12 (Miss. 2000) ("In this case sub judice there was absolutely no evidence to support emotional or mental anguish. The parents, suffering no bodily injury or trauma, have the burden to prove that the supervision of St. Andrew's was done maliciously, intentionally, or with such gross negligence to show an utter indifference to the consequence."); *see also Whitten v. Cox*, No. 1998-CA-01410-SCT, 2000 WL 1031777 (Miss. July 27, 2000). A plaintiff therefore may not recover emotional distress damages resulting from ordinary negligence, without proving some sort of physical manifestation of injury or demonstrable physical harm.

¶44. Wells and Oliver have failed to make such a showing of demonstrable physical harm, and their testimony is similar to that which we have held to be insufficient even in the more permissive line of cases. For example, Wells testified as follows:

> Q: Now, these increased payments and the calls that you received, what effect did they have on you personally, Ms. Wells?
>
> A. Caused a lot of stress.
>
> Q: Did you ever have any trouble sleeping at night?
>
> A: Yes, it was very stressful. I had a lot of restless nights . . . .

Oliver similarly testified, "Well, it was stressing. It was totally embarrassing when they called my job. It cost me a lot of sleepless night because we were having some financial difficulties, and we were trying our best to meet our obligations."

¶45. Wells and Oliver thus presented no evidence of demonstrative physical symptoms or harm as required under the majority line of cases, and their testimony is also similar to that which we have rejected as insufficient in the cases adopting the more liberal standard of recovery. *See, e.g.* **Adams**, 744 So. 2d at 743-44.

## B. Punitive Damages.

¶46. Wells and Oliver may recover punitive damages only if they established that Fidelity's and American Bankers' actions were "malicious, intentional, willful, wanton, grossly careless, indifferent or reckless." **Walker**, 725 So. 2d at 148. Wells and Oliver have failed to establish a cause of action against American Bankers because privity of contract did not exist between Wells, Oliver and American Bankers. The punitive damages award against this defendant should therefore be reversed.

¶47. With regard to Fidelity, however, a different result is appropriate. As discussed earlier, this case is remanded for consideration of claims that Fidelity engaged in bad faith in the performance of the contract and not on matters excluded for review under the filed rate doctrine. Assuming that the trial court concludes that certain allegations in Wells's and Oliver's complaints are not barred by this doctrine, the court should find that the jury may consider these allegations as they relate to Fidelity's (but not American Bankers') alleged breach of the duty of good faith and fair dealing. Given that these important issues are yet to be resolved, we are not issuing a ruling as to the availability of punitive damages against Fidelity.

## CONCLUSION

### Wells's Claims

¶48. We affirm the trial court's denial of the motions to dismiss Wells's claim of backdating CPI coverage because she never received notice of the backdating and the statute of limitations never began to run until, presumably, documents were produced during discovery.

¶49. We reverse and render the trial court's denial of Fidelity's motion for directed verdict pertaining to Wells's claim of not having the right to file a claim or collect proceeds under the force-placed policy

because Wells, having had no loss, did not have standing to raise such a claim.

¶50. We reverse and render the trial court's denial of Fidelity's motion for directed verdict pertaining to the accounting method used for calculating Wells's loan balance upon which CPI premiums were charged as she failed to prove this claim by a preponderance of the evidence.

¶51. We reverse and render the award of compensatory damages based on excessive premiums because this claim is barred by the filed rate doctrine.

¶52. We affirm the trial court's denial of the motions for directed verdict which pertained to tortious conduct in the performance of a contract and remand to the circuit court for further proceedings consistent with this opinion.

¶53. We reverse and render the trial court's denial of the motions for directed verdict on the ground of breach of fiduciary duty. This claim is dismissed.

¶54. We reverse and render the trial court's denial of the motions for directed verdict on Wells's claim of breach of good faith and fair dealing against American Bankers as there was no contractual relationship between Wells and American Bankers. We affirm the trial court's denial of Fidelity's motion for directed verdict on the ground of breach of good faith and fair dealing and remand to the circuit court for further proceedings consistent with this opinion.

¶55. We reverse and render the trial court's denial of the motions for directed verdict on the ground of fraud or civil conspiracy.

¶56. We reverse and render the trial court's denial of American Bankers' and Fidelity's motions for directed verdict on the grounds of emotional distress for lack of proof.

¶57. We reverse and render the trial court's denial of American Bankers' motion for directed verdict on punitive damages. We affirm the trial court's denial of Fidelity's motion for directed verdict on punitive damages and remand to the circuit court for further proceedings consistent with this opinion.

Oliver's Claims

¶58. We reverse and render the trial court's denial of the motions to dismiss Oliver's claim of backdating CPI coverage because he received reasonable notice of the backdating and the statute of limitations began to run as late as February, 1995.

¶59. We reverse and render the trial court's denial of Fidelity's motion for directed verdict pertaining to Oliver's claim of not having the right to file a claim or collect proceeds under the force-placed policy because Oliver, having had no loss, did not have standing to raise such a claim.

¶60. We affirm the trial court's denial of Fidelity's motion for directed verdict pertaining to the accounting method used for calculating Oliver's loan balance upon which CPI premiums were charged because Oliver never received reasonable notice of the accounting method used and the statute of limitations did not begin to run until, presumably, documents were produced during discovery.

¶61. We reverse and render the award of compensatory damages based on excessive premiums because this claim is barred by the filed rate doctrine.

¶62. We affirm the trial court's denial of the motions for directed verdict pertaining to the claims of tortious conduct in the performance of a contract and remand to the circuit court for further proceedings consistent with this opinion.

¶63. We reverse and render the trial court's denial of the motions for directed verdict pertaining to the claim of breach of fiduciary duty. This claim is dismissed.

¶64. We reverse and render the trial court's denial of the motions for directed verdict on Oliver's claim of breach of good faith and fair dealing against American Bankers as there was no contractual relationship between Oliver and American Bankers. We affirm the trial court's denial of Fidelity's motion for directed verdict on the ground of breach of good faith and fair dealing and remand to the circuit court for further proceedings consistent with this opinion.

¶65. We reverse and render the trial court's denial of the motions for directed verdict on the ground of fraud or civil conspiracy.

¶66. We reverse and render the trial court's denial of American Bankers' and Fidelity's motions for directed verdict on the grounds of emotional distress for lack of proof.

¶67. We reverse and render the trial court's denial of American Bankers' motion for directed verdict on punitive damages. We affirm the trial court's denial of Fidelity's motion for directed verdict on punitive damages and remand to the circuit court for further proceedings consistent with this opinion.

¶68. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART.**

> **PITTMAN, C.J., SMITH, P.J., COBB AND CARLSON, JJ., CONCUR. McRAE, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DIAZ AND EASLEY, JJ., GRAVES, J., NOT PARTICIPATING.**

> **McRAE, PRESIDING JUSTICE, DISSENTING:**

¶69. Because the plaintiffs' causes of action are based in the common law, they are not preempted by state statutes, i.e. Miss. Code Ann.§§ 83-1-1 et seq. (1999). The majority now seeks to not only invoke the filed rate doctrine in this case, but is attempting to expand it to include questions "which are subject to **oversight** by the Department of Insurance." (emphasis added). No authority is cited for this aggrandizement of the filed rate doctrine, and no guidance is given to the trial court in how to apply this new rule of law. The majority simply invites American Bankers and Fidelity to relitigate this case using an unprecedented and nebulous holding. This case is not about a filed rate doctrine. Based on our previous holding in *__American Bankers Ins. Co. v. Alexander__*, 2001WL 83952 (Miss. Feb. 1, 2001), I would affirm the trial court. Accordingly, I dissent.

¶70. As in *Alexander*, the case at bar involves claims for breach of fiduciary duty, breach of implied covenants of good faith and fair dealing, and fraud. In *Alexander* we held that these causes of action are not barred by the filed rate doctrine. All of these causes of action are founded in the common law, and this Court has previously held that such claims are not preempted by state statutes." *Id.* (citing *Protective Servs. Life Ins. Co. v. Carter*, 445 So. 2d 215, 216 (Miss. 1983)).

¶71. We also noted that Miss. Code Ann. § 83-5-33 expressly prohibits any person from engaging in trade practices that are "unfair or deceptive acts or practices [which] include misrepresentations and false advertisements, written misrepresentations, and false advertisements, and false information and advertising in general," regardless of the insurance commissioner's authority to approve rates.

¶72. Specifically, Wells and Oliver allege, and the jury agreed, that American Bankers and Fidelity backdated policies for up to six months, that the premiums were based on the gross amount of the loan rather than the net payoff amount of the loan, that the vehicle must have been repossessed before a claim could be filed, and that the rates were fraudulently inflated by basing premiums on eighteen months and adding a 45% surcharge to premiums.

¶73. This case, like *Alexander*, is not a "rate case," but is a combination of contract, tort, and statutory actions. In *Gelb v. AT&T Co.*, 813 F. Supp 1022, 1023 (S.D.N.Y. 1993), the plaintiff brought a combination of federal common law fraud and statutory claims. The federal court held that the filed rate doctrine would not protect a defendant who unlawfully extracted a payment, even if at a lawful rate, and that the doctrine could not be used to bar all tort claims. *Id.* That court noted, as we did in *Alexander*, that allowing the doctrine to bar such claims would virtually immunize defendants against common law claims, so long as they followed the filed rate.

¶74. Numerous jurisdictions have recognized, as have we in *Alexander*, that certain circumstances will preclude the application of the filed rate doctrine. *See H.J., Inc. v. Northwestern Bell Tel. Co.*, 954 F.2d 485, 490 (8th Cir. 1991) (holding filed rate doctrine to be arguably inapplicable if the claim does not attack the amount of the rate filed, and does not require the court to "second guess" the rate-making agency); *Gulf States Utils. Co. v Alabama Power Co*, 824 F.2d 1465, 1472 (5th Cir. 1987) (cause of action for fraudulent inducement will not be barred by the filed rate doctrine if it "would not interfere with the federal agency's rate-making powers"); *Litton Sys., Inc. v. American Tel. & Tel. Co.*, 700 F.2d 785, 820 (2d Cir. 1983) (filed rate doctrine not apply where the court was not called upon to even indirectly determine what a reasonable rate would have been); *City of Kirkwood v. Union Elec. Co.*, 671 F.2d 1173, 1179 (8th Cir. 1982) (filed rate doctrine does not bar the award of antitrust damages where plaintiffs did not challenge the reasonable of the rates, but rather their anti-competitive effect); *Wegoland, Ltd. v. NYNEX Corp.*, 806 F. Supp. 1112, 1116 (S.D.N.Y. 1992) (filed rate doctrine was "arguably inapplicable" in cases where the "courts are not asked to determine what a reasonable rate should be), *aff'd,* 27 F.3d 17 (2d Cir. 1994).

¶75. I further disagree with the majority's determination that "[w]e find that a fiduciary relationship between a lender and a borrower does not arise when the borrower breaches the lending contract." While it is true that issues regarding forced-placed CPI do not arise unless a borrower breaches the contract, this does **not** mean that a fiduciary duty cannot arise as a matter of law. Here, the majority attempts to take a big leap from existing law.

¶76. We have previously ruled on fiduciary duties in *Lowery v. Guaranty Bank & Trust Co.*, 592 So. 2d 79, 83 (Miss. 1991):

> "Fiduciary relationship" is a very broad term embracing both technical fiduciary relations **and those informal relations which exist whenever one person trusts or relies on another** . . . A fiduciary relationship may arise in a legal, moral, domestic, or personal context where there appears "on the one side an overmastering influence or, on the other side, weakness, dependance or trust

justifiably reposed."

(emphasis added). Significantly, whether a fiduciary duty exists is a question of fact. *Id.* at 85.

¶77. In addition to being agents of each other, American Bankers and Fidelity had contracted to provide insurance on the plaintiffs' vehicles. Because the plaintiffs had contracted with Fidelity for financing, and subsequently purchased insurance from American Bankers, they have reasonably expected that "both defendants would deal with them in good faith as such an obligation is imposed on parties who contract for performance of obligation with each other." *Alexander,* 2001 WL 83952, at * 11 (citing *Cenac v. Murry*, 609 So. 2d 1257 (Miss. 1992)). Furthermore, the contract between the plaintiffs and Fidelity was entered into on a "take it or leave it" basis, and the plaintiffs were clearly at a disadvantage in regard to sophistication and knowledge, as well as in a weaker financial position.

¶78. The existence of a fiduciary relationship cannot be precluded as a matter of law solely because the plaintiffs were in breach of their financing contract. The previously mentioned evidence substantially supports the finding that both American Bankers and Fidelity owed a fiduciary duty to the plaintiffs. The trial court found as much, and we should defer to its finding of fact.

¶79. Additionally, the majority concludes that a jury issue was created as to Fidelity, but inexplicably remands "for further proceedings" without further explanation. What further proceedings are needed on this issue? The jury has decided a jury issue, its decision was supported by the evidence, and its decision should stand.

¶80. The issues raised in the case before us are not barred by the filed rate doctrine, as they are founded in the common law and do not require the court to determine what a reasonable rate would have been, thereby "second guessing" the Department of Insurance. The holding of the majority is in direct conflict with our prior holding in *American Bankers v. Alexander*, and has no precedential support. Furthermore, the majority attempts to give Fidelity and American Bankers a "second bite at the apple" by remanding jury issues that have already been decided by the jury against both Fidelity and American Bankers, and are supported by substantial evidence. Accordingly, I dissent.

**DIAZ AND EASLEY, JJ., JOIN THIS OPINION.**

1. Fidelity Financial Services, Inc., and Fidelity Acceptance Corporation were named as defendants. Fidelity Financial Services, Inc., provides consumer loans in the State of Mississippi. Fidelity Acceptance Corporation, a Delaware Corporation, is a separate corporation. Fidelity Financial Services, Inc., a Mississippi corporation., is a wholly owned subsidiary of Fidelity Acceptance Corporation. The parties stipulated that Wells and Oliver entered into promissory note and security agreements with Fidelity Financial Services, Inc.

The parties further stipulated that under the collateral protection insurance program, Fidelity Acceptance advanced the premium and commission, then charged that cost to Fidelity Financial Services, Inc., as a corporate loan. Fidelity Financial Services, Inc., then charged the individual plaintiffs' accounts for the collateral protection insurance. These facts constitute the totality of the proof on Fidelity Acceptance's role with regard to the facts of this case.

2. We have issued an opinion in an interlocutory appeal arising from another of the American Bankers cases, *American Bankers Ins. Co. v. Alexander,* No. 2001 WL 83952, #98-IA-00046-SCT (Miss.

Feb. 1, 2001). We found that the claims presented did not fall under the filed rate doctrine and that plaintiffs' claims should therefore not be precluded. Unlike *Alexander*, however, the present appeal arises following a trial on the merits, rather than on interlocutory appeal prior to trial. As such, this Court has before it in the record the allegations and evidence raised by the plaintiffs at trial. This record makes it abundantly clear that the plaintiffs alleged before the jury that the CPI policy rates were too high and sought to recover on this basic issue.